765 A.2d 182

PATRICIA CARAVAGGIO, PLAINTIFF–APPELLANT, AND ROBERT CARAVAGGIO, HER HUSBAND, PLAINTIFF, v. ROBERT D'AGOSTINI, M.D., DEFENDANT–RESPONDENT, AND MORRISTOWN MEMORIAL HOSPITAL, AND XYZ CORPORATION, (SAID NAME BEING FICTITIOUS AND PRESENTLY UNKNOWN), DEFENDANTS.

Argued October 24, 2000—Decided January 22, 2001.

238

*Charles S. Lorber* argued the cause for appellant (*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg*, attorneys).

*Melvin Greenberg* argued the cause for respondent (*Greenberg Dauber Epstein & Tucker*, attorneys; *Mr. Greenberg* and *Stephen O. Mortenson*, on the briefs).

The opinion of the Court was delivered by

LONG, J.

The discovery rule, incorporating as it does a notion of simple justice, has been anything but simple in application, as evidenced by the amount of litigation it has spawned. Decades after its enunciation, lawyers and judges are still grappling with its application. This is another such case.

*I*

Plaintiff Patricia Caravaggio and her husband were seriously injured in a motorcycle accident on May 23, 1993. Mrs. Caravaggio's specific injury was a segmental fracture of the femur, also called the thighbone. She was taken by ambulance to Morristown

Memorial Hospital where the defendant, Dr. Robert D'Agostini, an orthopedic surgeon, performed surgery to repair the bone. Dr. D'Agostini "reamed out" Mrs. Caravaggio's femur bone, inserted a rod manufactured by the Synthes Corporation in the hollow of the bone, and affixed the rod with screws through the bone at both ends to stabilize the fracture.

Mrs. Caravaggio was discharged from the hospital and underwent physical therapy at home, remaining under the care of Dr. D'Agostini who had previously explained to her that she could expect an average healing time of twelve weeks, and that among the complications possible were "infection, blood clots, blood loss or anemia, failure to heal, need for rod removal later, rod breakage." On June 15, 1993, Dr. D'Agostini modified the physical therapy prescription to permit as much weight-bearing on the injured leg as Mrs. Caravaggio could tolerate. On July 13, 1993, Dr. D'Agostini told Mrs. Caravaggio to increase the vigor of her physical therapy, noting that she should continue to use crutches and to bear weight on her injured leg. Two weeks later on July 28, 1993, Mrs. Caravaggio felt a "snap" in her leg while the physical therapist was bending her knee.

Dr. D'Agostini examined Mrs. Caravaggio at his office on August 4, 1993. An x-ray of the leg revealed that the rod had broken through the screw holes. Dr. D'Agostini told Mrs. Caravaggio that he was "very much surprised" that a rod manufactured by Synthes, "probably the best manufacturer of rods in the world", could break in eight weeks. According to D'Agostini,

I have had ... totally irresponsible people throw away their crutches, walk on these things and they never break.

. . .

I was shocked that the thing broke and so I told them [the Caravaggios] that was surprising. They were, as I—they can characterize their recollections, but it's my recollection that they were, you know, more mad at the physical therapist, that it had been the vigor or physical therapy bending the knee.

And I told them no, that that was not the case. That the physical therapist was doing what I told them to do and that in any case no single bend, no human being could take that rod and snap it, *no physical therapist with a rod inside somebody's*

*leg could cause that rod to snap unless there was something structurally wrong with it.* (emphasis added).

Dr. D'Agostini explained to Mrs. Caravaggio that her injuries would now take longer to heal and could require additional surgery to replace the rod. First, however, he recommended bracing and conservative treatment to attempt to avoid additional surgery. Mrs. Caravaggio accepted his recommendation. She continued with follow-up visits, but by September 28, 1993, the doctor determined that her femur would not heal without further surgery.

In early October, Mrs. Caravaggio obtained a second opinion from an orthopedist for insurance purposes. That physician agreed with Dr. D'Agostini's recommendation of surgery and, although he indicated that perhaps Dr. D'Agostini might have chosen a thicker rod to implant, did not suggest directly or obliquely that Mrs. Caravaggio should question the medical care she received from Dr. D'Agostini. Mrs. Caravaggio continued in Dr. D'Agostini's care and he performed the second surgery on October 21, 1993, to replace the broken rod. In that surgery, he "reamed" the femur bone more extensively and inserted a thicker and longer rod.

After the second surgery, Dr. D'Agostini informed Mrs. Caravaggio that there was something wrong with the rod and that she should take it to the lawyer who was representing her in her lawsuit against the operator of the car that struck her. The rod was then sent to the hospital's pathology lab, and at some later date (not determined with specificity in the record) the rod was given to the attorney representing Mrs. Caravaggio in her ongoing auto negligence litigation.

After Mrs. Caravaggio's discharge, in May of 1994, her husband continued to be treated by Dr. D'Agostini well into the fall of 1995, over two and one-half years from the accident. During that period, Mr. and Mrs. Caravaggio both referred family and friends to him.

In the meantime, on July 28, 1994, Mrs. Caravaggio's counsel sent the rod to be analyzed by J. Stephen Duerr, President of Metuchen Analytical. Metallurgic tests revealed that the rod was not defective. The record is unclear exactly when that information was received, although it was certainly after July 1994.

In late 1994 or early 1995, Mrs. Caravaggio met a new attorney who suggested that she might have a medical malpractice claim. She retained that attorney who, in turn, referred her to her present counsel, who filed a complaint on her behalf against Dr. D'Agostini on September 15, 1995.

■ Dr. D'Agostini moved for summary judgment, arguing that Mrs. Caravaggio's complaint was barred by the expiration of the two year statute of limitations. The trial court ordered a discovery rule hearing as required by *Lopez v. Swyer*, 62 *N.J.* 267, 300 *A.2d* 563 (1973). After the hearing, at which the facts related in this opinion were established and presumably viewed in a light most favorable to Mrs. Caravaggio pursuant to *R.* 4:46–2(c), the court granted the motion, concluding that Mrs. Caravaggio knew or should have known that she had an actionable claim against Dr. D'Agostini no later than August 4, 1993:

> [P]laintiff knew she suffered an injury on July 28 or 29, 1993. At that time she believed that the injury was caused by the physical therapist and she expressed that opinion to defendant on August 4, 1993, when she learned that the rod had broken.

> . . .

> Arguably, defendant's statement may have "lulled" plaintiff into believing that the wrongdoer was neither the physical therapist nor the defendant, because implicit in defendant's statement was an assurance that the physical therapy defendant ordered was actually proper.

Nevertheless, the court concluded that because Mrs. Caravaggio knew she was injured on August 4, 1993, and that "the injury was the product of *someone's* wrongdoing," summary judgment was

appropriate because her cause of action accrued on that date and her complaint was filed two years and fifty-two days later.[1]

The Appellate Division affirmed the trial court's judgment because "the judge's factual findings and conclusions of law [on the statute of limitations issue] are supported by sufficient evidence in the record and the applicable law." *Caravaggio v. D'Agostini*, No. A–91–98T5, slip op. at 4 (App.Div. November 15, 1999). According to the Appellate Division, and based on statements she made to Dr. D'Agostini about the physical therapist, Mrs. Caravaggio knew on August 4, 1993 that she had been wrongfully injured and that someone should be held accountable. We granted Mrs. Caravaggio's petition for certification on January 28, 2000, 164 *N.J.* 560, 753 *A.*2d 1153 (2000), limited solely to the statute of limitations issue.[2] We now reverse.

## II

*N.J.S.A.* 2A:14–2 gives a plaintiff a two year period from the accrual of his or her claim in which to file a malpractice action. At common law, there was no limit on the time in which a plaintiff could institute such litigation. *Rothman v. Silber*, 90 *N.J.Super.* 22, 216 *A.*2d 18 (App.Div.1966) (citing *Uscienski v. National Sugar Refining Co.*, 19 *N.J. Misc.* 240, 242, 18 *A.*2d 611 (C.P.

---

[1] In rendering its opinion, the trial court ventured that Mrs. Caravaggio should have filed a complaint within two years from August 4, 1993, naming fictitious defendants until the identity of the wrongdoer could be established as allowed by *R.* 4:26–4. *R.* 4:26–4 is entirely irrelevant in these circumstances. *Gallagher v. Burdette–Tomlin Mem'l Hosp.*, 318 *N.J.Super.* 485, 492, 723 *A.*2d 1256 (App. Div.), *appeal granted*, 160 *N.J.* 86, 733 *A.*2d 491 (1999). The fictitious defendant rule was promulgated to address the situation in which a plaintiff is aware of a cause of action against a defendant but does not know the defendant's identity. *Younger v. Kracke*, 236 *N.J.Super.* 595, 599, 566 *A.*2d 581 (Law Div.1989). That is not the case here.

[2] In rendering summary judgment in favor of Dr. D'Agostini, the trial court also ruled that the entire controversy doctrine barred Mrs. Caravaggio's claim. (*Caravaggio v. D'Agostini*, No. MRS–L–3095–95, slip. op. at 11–13 (Law Div. July 28, 1998)). The entire controversy doctrine was not addressed by the Appellate Division, nor does the grant of certification include that issue.

1941)). Since then, statutes of limitations have been adopted regarding all causes of action, in order to "promote repose by giving security and stability to human affairs." *Wood v. Carpenter,* 101 *U.S.* 135, 139, 25 *L.Ed.* 807 (1879). Their purpose is to

> penalize dilatoriness and serve as measure of repose. * * * When a plaintiff knows or has reason to know that he has a cause of action against an identifiable defendant and voluntarily sleeps on his rights so long as to permit the customary period of limitations to expire, the pertinent considerations of individual justice as well as the broader considerations of repose, coincide to bar his action. Where, however, the plaintiff does not know or have reason to know that he has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice and the considerations of repose are in conflict and other factors may fairly be brought into play.
>
> [*Farrell v. Votator Div. of Chemetron Corp.,* 62 *N.J.* 111, 115, 299 *A.2d* 394 (1973); *Fernandi v. Strully,* 35 *N.J.* 434, 438, 173 *A.2d* 277 (1961).]

The latter principle is embodied in the so-called "discovery rule." *Vispisiano v. Ashland Chemical Co.,* 107 *N.J.* 416, 527 *A.2d* 66 (1987). The purpose behind the rule

> "is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." [*Vispisiano, supra,* 107 *N.J.* at 426, 527 *A.2d* 66]. Accordingly, the doctrine "postpon[es] the accrual of a cause of action" so long as a party reasonably is unaware either that he has been injured, or that the injury is due to the fault or neglect of an identifiable individual or entity. *Id.* at 426–27, 527 *A.2d* 66; *accord Lynch v. Rubacky* 85 *N.J.* 65, 70, 424 *A.2d* 1169 (1981); *Lopez, supra,* 62 *N.J.* at 274, 300 *A.2d* 563. Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware "of that state of facts which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291, 386 *A.2d* 1310 (1978).
>
> [*Abboud v. Viscomi,* 111 *N.J.* 56, 62–63, 543 *A.2d* 29 (1988).]

"The linchpin of the discovery rule is the unfairness of barring claims of unknowing parties." *Mancuso v. Neckles,* 163 *N.J.* 26, 29, 747 *A.2d* 255 (2000).

In *Baird v. American Med. Optics,* 155 *N.J.* 54, 713 *A.2d* 1019 (1998), we articulated that principle more fully:

> Critical to the running of the statute is the injured party's awareness of the injury and the fault of another. *Savage v. Old Bridge–Sayreville Medical Group, P.A.* 134 *N.J.* 241, 243, 633 *A.2d* 514 (1993). The discovery rule prevents the statute of limitations from running when injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is

attributable to the fault of another. *Tevis v. Tevis,* 79 *N.J.* 422, 432, 400 *A.*2d 1189 (1979).

[*Id.* at 66, 713 *A.*2d 1019.]

The question in a discovery rule case is whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another. The standard is basically an objective one-whether plaintiff "knew or should have known" of sufficient facts to start the statute of limitations running. *Baird, supra,* 155 *N.J.* at 72, 713 *A.*2d 1019.

That does not mean that the statute of limitations is tolled until a plaintiff has knowledge of a specific basis for legal liability or a provable cause of action. *Savage v. Old Bridge-Sayreville Medical Group, P.A.* 134 *N.J.* 241, 248, 633 *A.*2d 514 (1993). It does, however, require knowledge not only of the injury but also that another is at fault. *Id.* at 246, 633 *A.*2d 514; *Lynch, supra,* 85 *N.J.* at 70, 424 *A.*2d 1169. Both are critical elements in determining whether the discovery rule applies. For that analysis, it has been held that plaintiffs are to be divided into classes: those who do not know that they have been injured and those who know they have suffered an injury but do not know that it is attributable to the fault of another. *Lopez, supra,* 62 *N.J.* at 274, 300 *A.*2d 563. When a plaintiff's claim falls within the latter class her cause of action does not accrue until she has knowledge of the injury and that such injury is the fault of another.

In many cases, knowledge of fault is acquired simultaneously with knowledge of injury. Fault is apparent, for example, where the wrong tooth is extracted during surgery. *Tramutola v. Bortone,* 118 *N.J.Super.* 503, 512–13, 288 *A.*2d 863 (App.Div.1972), or where a foreign object has been left within the body after an operation. *See Fernandi, supra,* 35 *N.J.* at 438, 173 *A.*2d 277 (holding that period of limitations on a patient's negligence cause of action began to run when the patient knew or had reason to know about the foreign object left in her body). In other cases, however, a plaintiff may be aware of an injury but not aware that the injury is attributable to the fault of another.

In *Lopez, supra,* 62 *N.J.* at 271, 300 *A.2d* 563, for example, the plaintiff suffered from severe burns, pain, and nausea after undergoing radiation therapy following a radical mastectomy for breast cancer. Plaintiff's husband had previously been told by a physician that "this was not malpractice. This sometimes happens." *Lopez v. Swyer,* 115 *N.J.Super.* 237, 244, 279 *A.2d* 116 (App.Div. 1971). While Ms. Lopez was being treated for her symptoms by another doctor, she overheard him say to colleagues, "[a]nd there you see, gentlemen, what happens when the radiologist puts a patient on the table and goes out and has a cup of coffee." *Lopez, supra,* 62 *N.J.* at 271, 300 *A.2d* 563. The Appellate Division reversed the trial court's grant of summary judgment for the radiologist, and this Court affirmed. Although Ms. Lopez knew that her burns were caused by the radiation therapy, the record did not reveal that she knew or should have known, prior to overhearing the "cup of coffee" statement, of the causal connection between her physician's negligent treatment and her injury. Thus her complaint, filed slightly over five years after her injury, but within two years of the "cup of coffee" statement, was ruled timely.

Likewise, in *Lynch, supra,* 85 *N.J.* at 67–68, 424 *A.2d* 1169, the plaintiff injured her ankle and was operated on by the defendant. When she did not improve and suffered great pain and disability, the defendant continually assured her that her condition was due to the original injury and the healing process. It was not until after the statute of limitations expired that another physician suggested that the plaintiff's problem was due to the defendant's negligence. *Id.* at 69, 424 *A.2d* 1169. We held that "all of the factors militating against adequate knowledge of physician fault" were present in the case. *Id.* at 77, 424 *A.2d* 1169. Included were the plaintiff's faith in the defendant, his reassurances that the pain and swelling were part of the healing process, and the fact that a physician who the plaintiff later consulted did not suggest the defendant's medical negligence until after the statute had run. *Ibid.* We thus held her action to be timely.

"A sub-category of the 'knowledge of fault' cases is that in which a plaintiff knows she has been injured and knows the injury was the fault of another, but does not know that an additional party was also responsible for her plight." *Martinez v. Cooper Hosp.* 163 *N.J.* 45, 54, 747 *A.*2d 266 (2000) (citing *Savage, supra,* 134 *N.J.* at 243, 633 *A.*2d 514). In *Martinez,* the plaintiff's fiancee, Carl Farrish, was badly beaten in a street fight and died at the hospital shortly thereafter. The plaintiff knew of his injury and that it was the fault of another-the person who administered the beating. Indeed, Farrish's death certificate and accompanying publicity reflected that the death was a homicide. In addition, the physician at the hospital told the plaintiff "they did all they could." *Id.* at 49, 747 *A.*2d 266. Because the plaintiff was not present at the hospital, she did not know that, despite the fact that Farrish was *in extremis,* he waited for many hours before he received any medical treatment. On those facts, we held that the plaintiff "had no reason to suspect malpractice", *id.* at 57, 747 *A.*2d 266, until her lawyer was notified, in an anonymous letter, of what occurred at the hospital on the night of the beating. Thus, the complaint filed three and one-half years after Farrish's death, but within two years of the anonymous letter, was timely. In effect, *Martinez* reaffirmed that a cause of action may accrue against different defendants at different times.

*Savage* is another good example of that principle. In *Savage,* the plaintiff filed a medical malpractice action against physicians who had administered tetracycline to her in early childhood. The drug apparently discolored her teeth. The plaintiff became twenty-one in 1981. Until then the statute was tolled by reason of her age. She filed a complaint in 1989 alleging she was unaware until 1988 that her injury was due to the fault of her doctors. The trial judge ruled that because she had all the "facts" in 1981 at the time she reached majority, *i.e.* that her teeth were discolored and that medication given to her as a child might have caused the discoloration, she had only two years to bring suit. The Appellate Division disagreed. *Savage v. Old Bridge–Sayreville Medical Group, P.A.* 260 *N.J.Super.* 417, 616 *A.*2d 1307 (1992). It reasoned that,

although the plaintiff was aware that she had suffered injury and that the medication was a likely cause of it, the record did not reveal anything to suggest that she was or should have been aware that a lack of care in administering the medication was also a cause of her condition. *Id.* at 421–22, 616 *A.*2d 1307.

We agreed with the Appellate Division's conclusion that, although plaintiff was aware of her injury and that the medicine was a likely cause of it, she was not aware that her injury was additionally due to her physicians' avoidable fault. *Savage, supra,* 134 *N.J.* at 247, 633 *A.*2d 514. In so ruling, we distinguished Savage's claims from those of the plaintiff in *Apgar v. Lederle Labs,* 123 *N.J.* 450, 453, 588 *A.*2d 380 (1991), whose untimely suit against the manufacturer we held time barred because the plaintiff knew, by the time she was eighteen years old, that the medicine she had taken as a child had discolored her teeth, that that medicine "had not been thoroughly tested", and that "certain things weren't right."

Two other cases that are instructive are *Gallagher v. Burdette–Tomlin Mem'l Hosp.* 163 *N.J.* 38, 747 *A.*2d 262 (2000), and *Mancuso.* In *Gallagher, supra,* 163 *N.J.* at 43–44, 747 *A.*2d 262, we held recently that a plaintiff could invoke the discovery rule long after she sued her surgeon for malpractice when she discovered that her after-care physicians were also at fault. That information was first made known to her during discovery in the case against the surgeon. *Ibid.* In *Mancuso, supra,* 163 *N.J.* at 36–37, 747 *A.*2d 255, we held that although the plaintiff pursued a malpractice cause of action against her surgeon, because she did not know or have reason to know that she also had a cause of action against her radiologist until she heard of his alleged malpractice during discovery in the original action, she could invoke the discovery rule to begin an action against him more than two years after his alleged malpractice.

*Martinez, Savage, Gallagher* and *Mancuso* reaffirm the basic principle that where a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty

to act. However, those cases also stand for the proposition that when a plaintiff knows of an injury, and knows that it is the fault of another, but is reasonably unaware that a third party may also be responsible, the accrual clock does not begin ticking against the third party until the plaintiff has evidence that reveals his or her possible complicity. Moreover, "notwithstanding that plaintiff discovers his cause of action for malpractice prior to the expiration of two years from the date of the actionable conduct, he nevertheless will ordinarily be allowed two full years from the date of such discovery to bring his action." *Moran v. Napolitano*, 71 *N.J.* 133, 134, 363 *A.*2d 346 (1976)(citing *Fox v. Passaic Gen. Hosp.*, 71 *N.J.* 122, 126, 363 *A.*2d 341 (1976)).

### III

Both the trial court and the Appellate Division ruled the complaint untimely by fifty-two days based on the notion that on August 4, 1993, Mrs. Caravaggio knew or should have known that she was injured and that Dr. D'Agostini bore some responsibility for that injury.

We disagree with that rather expansive view of what a reasonable person would or should have known on August 4, 1993. On that date, Mrs. Caravaggio was told by Dr. D'Agostini that there must have been something "structurally wrong" with the rod and that nothing the physical therapist did, at his behest, could have caused it to snap. It appears that those statements were made in good faith by Dr. D'Agostini who, even at the time of the *Lopez* hearing on May 22, 1998, and despite the metallurgic analysis, still believed that the Synthes Rod was defective. On August 4,1993, Mrs. Caravaggio had no reason to assume either that he was being untruthful or that he had committed malpractice in the surgery. Indeed, that she did not believe so is underscored by the fact she later underwent further surgery at his hands, that her husband continued in his care, and that both of them referred family and friends to him. It was only when the rod was removed and found not to be defective that Mrs. Caravaggio might possibly have had

reason to look elsewhere. The rod removal took place on October 21, 1993, and the complaint against Dr. D'Agostini was filed within two years of that date.[3]

To be sure, Mrs. Caravaggio knew she was injured on August 4, 1993, and, in light of Dr. D'Agostini's statements, had reason to believe that the rod manufacturer was at fault as of that date. That is quite different from knowing or even suspecting Dr. D'Agostini's possible malpractice. Indeed, Mrs. Caravaggio was told, as part of the informed consent ritual at the time of the surgery, that even a procedure performed properly could result in the untoward complication of "rod breakage."

On August 4, 1993, when Mrs. Caravaggio knew the rod had broken, Dr. D'Agostini absolved the physical therapist and, inferentially, himself, indicating that the only thing he could think of was that there was something "structurally wrong" with the rod. Thus, on that date, Mrs. Caravaggio might reasonably have believed either that the rod breakage was just a "complication" of the surgery or that the manufacturer was responsible. She was entirely reasonable in not assuming that Dr. D'Agostini or the therapist were to blame.

Until the rod was removed and analysis revealed that it was not defective, there was no reason for Mrs. Caravaggio to suspect some other cause. Even then, Dr. D'Agostini's negligence was not necessarily implicated. This is not a *res ipsa* case. *Buckelew v. Grossbard*, 87 *N.J.* 512, 525, 435 *A.2d* 1150 (1981) (confirming use of *res ipsa loquitur* in medical malpractice cases, such that an inference of defendant's negligence is permitted "where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c)

---

[3] Because the complaint was timely based on the date of the rod removal, it was not necessary to ascertain exactly when the rod analysis was completed. Obviously that date would be critical if plaintiff had filed her suit more than two years from the second surgery. Such a case would also implicate the question of whether the rod was analyzed in a timely fashion. Those questions are not present in this case.

there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." (quoting *Bornstein v. Metropolitan Bottling Co.*, 26 *N.J.* 263, 269, 139 *A.*2d 404 (1958))). As we have noted, Dr. D'Agostini himself acknowledged that he advised Mrs. Caravaggio that rod breakage was a possible complication of properly performed surgery. It thus does not necessarily follow that a reasonable person would have concluded that one of the "universe" of defendants (manufacturer, therapist, physician) had to be responsible.

In *Martinez, supra,* in a different context, we said:

> It is not necessary every time a person dies in a hospital for his or her relatives to immediately suspect malpractice. People die in hospitals in the absence of wrongdoing (for example, those gravely injured in accidents and the infirm elderly). Many times complications arise even if a procedure is performed perfectly. Medicine is not an exact science. *Newmark v. Gimbel's,* 54 *N.J.* 585, 596–97, 258 *A.*2d 697 (1969). The rule accepted by the lower courts, that Ms. Martinez was unreasonable because she did not obtain and analyze Farrish's medical records even though she was not suspicious, encourages mistrust and essentially pits patients against their physicians even in cases where there is not even a trace of negligence apparent.

[163 *N.J.* at 58, 747 *A.*2d 266.]

That language is equally applicable here. Sometimes surgery results in complications, even if all procedures were performed correctly. People have heart attacks under anesthesia, develop blood clots, experience problems with wound healing, reject implants, and suffer failure of mobility after joint replacements. The possibilities, unfortunately, are legion. That is why surgery is always a last resort and why a patient is informed, prior to surgery, that a good result cannot be guaranteed even if the surgery is faultless.

Dr. D'Agostini did not cause Mrs. Caravaggio's original injury. He was retained to bring her back to health. That is what he was trying to do when he implanted the Synthes rod. When it broke and he told Mrs. Caravaggio that there must have been something structurally wrong with the rod, and assured her that the physical therapist could not have done anything to break a non-defective rod, there was no reason whatsoever for her to be suspicious of

him. If the rulings of the trial court and the Appellate Division to the contrary were to be approved, it would have the untoward effect of pitting patients against their physicians, at a time at which they have no reason to doubt their physicians, in order not to risk losing their cause of action altogether.

It may be that after discovery and a trial on the merits, a jury will find that Dr. D'Agostini's performance of Mrs. Caravaggio's surgery was deficient. Our inquiry is solely focused on the period of time in 1993 when Mrs. Caravaggio learned the rod had broken. So focused, it is clear that her complaint was timely.

## IV

Under presently existing standards governing the discovery rule, Mrs. Caravaggio acted in an objectively reasonable way in this matter, and the facts and circumstances, as known to her on August 4, 1993 did not warrant her concluding that Dr. D'Agostini was guilty of malpractice. She filed suit within two years of the removal of the rod. That was plainly within time.

## V

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for proceedings consistent with this opinion.

LaVECCHIA, J., dissenting.

Unlike the majority, I do not see this as a difficult case in which a court must grapple with the application of the discovery rule. On the uncontested facts here, it seems clear to me that the equity principles of the discovery rule are ultimately of no assistance to plaintiff. Her cause of action was not timely brought and therefore was properly dismissed. For that reason, I respectfully dissent.

Enforcement of statutes of limitations is the general rule, and discovery doctrine, as a tool of equity, is designed as an exception to that general rule. The essential purpose of the discovery rule

"is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 426, 527 *A.2d* 66 (1987). When a statute of limitations operates as it should to cut off a cause of action, that does not necessarily constitute a "harsh result." That is the very nature of a limitation of actions, and a statute bars whether the suit is instituted one day, fifty-two days, or several years after the time period expires. I believe some straightforward discovery-rule principles dictate an outcome different from the Court's disposition.

Not that long ago, we reiterated that "[w]e impute discovery if the plaintiff is aware of facts that would alert a reasonable person to the possibility of an actionable claim; medical or legal certainty is not required." *Lapka v. Porter Hayden Co.*, 162 *N.J.* 545, 555–56, 745 *A.2d* 525 (2000). The critical elements in determining whether the discovery rule applies is a plaintiff's knowledge of injury and knowledge that another is at fault. *Martinez v. Cooper Hosp.–Univ. Med. Ctr.*, 163 *N.J.* 45, 52, 747 *A.2d* 266 (2000). With regard to the "fault" prong, we again have framed our understanding in terms of possibilities, not certainties:

> "Fault" in the context of the discovery rule is simply that it is possible—not provable or even probable–that a third person's conduct that caused the injury was itself unreasonable or lacking in due care. In other words, knowledge of fault does not mean knowledge of a basis for legal liability or a provable cause of action; knowledge of fault denotes only facts suggesting the possibility of wrongdoing. Thus, knowledge of fault for purposes of the discovery rule has a circumscribed meaning: it requires only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care.
>
> [*Savage v. Old Bridge–Sayreville Med. Group, P.A.*, 134 *N.J.* 241, 248, 633 *A.2d* 514 (1993).]

No dispute exists that "[t]he linchpin of the discovery rule is the unfairness of barring claims of unknowing parties." *Mancuso v. Neckles,* 163 *N.J.* 26, 29, 747 *A.2d* 255 (2000). We articulated that "linchpin," however, in the context of our statement that "[s]tatutes of limitations are primarily statutes of repose. They are designed to stimulate litigants to pursue their actions diligently."

*Ibid.* We have built that design for diligent pursuit of actions into our discovery doctrine, so that the underlying question "is whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another." *Martinez, supra,* 163 *N.J.* at 52, 747 *A.*2d 266.

My answer to that basic question in this case is that a reasonable person exercising ordinary diligence should have discovered that she was injured due to the fault of another on August 4, 1993. On that date, plaintiff's leg was x-rayed, and defendant-doctor confirmed that the rod had broken through the screw holes. In confirming the rod breakage, defendant affirmatively suggested that someone was to blame because the rod should not have broken. On August 4, 1993, therefore, plaintiff had an indication that she had an injury, that the injury was due to the fault of another, and that a limited universe of potential suspects caused the injury. Understood in *Savage* terms, plaintiff had or should have had knowledge of "facts suggesting the possibility of wrongdoing," and had or should have had an awareness of facts suggesting that another's conduct "may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care." Plaintiff had actual or constructive knowledge of those facts because the defendant himself so informed her. A discovery event for accrual purposes is evident when a doctor tells a patient pointblank that an injury has indeed occurred and that it should not have happened. If fault was not implicit or self-evident in the injury itself, fault became obvious when the doctor effectively said "someone is at fault."

The Court attaches significance to the notion that defendant inferentially absolved himself of fault when he told plaintiff that the physical therapist was not to blame and thus that the rod must have been impaired by a structural defect. *Ante* at 250, 765 *A.*2d at 189. This is not a case, however, in which a doctor's various representations reasonably induced a plaintiff not to sue within a limitations period. In *Abboud v. Viscomi,* 111 *N.J.* 56, 59, 543 *A.*2d 29 (1988), for example, the plaintiff's physician erroneously

explained to her that her continuing discomfort after a tooth extraction was a normal part of the healing process and that her condition was impermanent. The Court remanded the matter to the trial court to determine whether the plaintiff's failure to sue within the limitations period was due to the doctor's erroneous representations. *Id.* at 65, 543 *A.*2d 29.

Another example is found in *Lynch v. Rubacky,* 85 *N.J.* 65, 424 *A.*2d 1169 (1981). There, the defendant-doctor performed surgery to repair the plaintiff's broken ankle. *Id.* at 67, 424 *A.*2d 1169. When the plaintiff continued to experience a great deal of pain after that surgery, the doctor consistently assured her that her condition was a natural part of the healing process and would eventually go away. *Id.* at 68, 424 *A.*2d 1169. The Court concluded that "a doctor's repeated assurances of progress may reinforce the reluctance of an average patient to find medical fault." *Id.* at 75, 424 *A.*2d 1169; *see also, e.g., Alfone v. Sarno,* 139 *N.J.Super.* 518, 524–25, 354 *A.*2d 654 (App.Div.) (concluding that evidence did "not support a finding that under the circumstances there should have existed in her mind a disbelief in her physician or a suspicion that he himself was at fault. Quite the contrary he was giving her assurance"), *certif. denied,* 71 *N.J.* 498, 366 *A.*2d 654 (1976). In *Martinez, supra,* 163 *N.J.* at 57, 747 *A.*2d 266, doctors assured the plaintiff that "they did all they could" for decedent.

Unlike the doctors in *Abboud, Lynch,* and *Martinez,* defendant in this case did anything but assure plaintiff that the "snap" she had heard in her leg was a natural part of the healing process. Defendant here offered no rosy prognoses, immediately informing plaintiff that something had gone terribly wrong, that recovery would be prolonged, and that rod replacement might be necessary to heal her original injury. To be sure, defendant did not then say, "My medical malpractice caused the injury." However, defendant need not have issued such a *mea culpa* to impute knowledge of injury and fault to plaintiff. Also, although defendant may have informed plaintiff before surgery that rod breakage was a possible complication of surgery performed properly, defendant's

later expression of shock at the actual breakage belies a suggestion that the breakage was a mere complication.

Nor is this a case involving complex medical causation and masked injury, again distinguishing cases relied upon by the Court. For example, in the companion cases of *Mancuso v. Neckles, supra,* 163 *N.J.* at 34, 747 *A.*2d 255, and *Gallagher v. Burdette–Tomlin Mem'l Hosp.,* 163 *N.J.* 38, 43, 747 *A.*2d 262 (2000), we explained that, for discovery rule purposes, the justification for a delayed claim depends on the type of case. A case involving complex causation and masked injury requires special focus on the "nature of the information" the claimant possessed, *Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255, and special attention to the difficulties the plaintiff faced in determining fault, *Gallagher, supra,* 163 *N.J.* at 43, 747 *A.*2d 262. We emphasized in both cases that complex medical-causation cases implicate intrinsic hardship because "[n]ot only is the nature of the injury generally unclear, its very existence is frequently masked." *Ibid.; Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255 (quoting *Vispisiano, supra,* 107 *N.J.* at 434, 527 *A.*2d 66). In *Gallagher, supra,* 163 *N.J.* at 43, 747 *A.*2d 262, we determined that the plaintiff-patient "had no reason to suspect that her crippling condition" of an abscess that developed following urologic surgery "was caused by anything other than the original surgery." In *Mancuso, supra,* 163 *N.J.* at 35, 747 *A.*2d 255, we concluded that plaintiff had no reason to believe that the spread of her cancer was attributable to belated diagnosis, rather than the unfortunate ravages of the disease. The facts of this case do not fit within that framework. A snapped support rod in a person's leg is hardly a masked injury, and the likely causal factors suggest themselves.

The Court relates *Gallagher* and *Mancuso* to two other cases, *Martinez, supra,* and *Savage, supra.* "Knowledge-of-fault" cases have a subcategory in which "a plaintiff knows she has been injured and knows the injury was the fault of another, but does not know that an additional party was also responsible for her plight." *Martinez, supra,* 163 *N.J.* at 54, 747 *A.*2d 266 (citing

*Savage, supra,* 134 *N.J.* at 243, 633 *A.*2d 514). According to the Court, *Martinez, Savage, Gallagher,* and *Mancuso* "stand for the proposition that where a plaintiff knows of an injury, and knows that it is the fault of another, but is reasonably unaware that a third party may also be responsible, the accrual clock does not begin ticking against the third party until plaintiff has evidence that reveals his or her possible complicity." *Ante* at 250, 765 *A.*2d at 189. Even accepting for the sake of argument that those cases stand for such a proposition, I am not convinced that the proposition carries decisive force in this case for two reasons.

First, defendant-doctor here is not a "third party" who might "also" be responsible for plaintiff's injury. In the matter before us, we have an injury attributable to the fault of a limited universe of suspects: the rod manufacturer, the physical therapist, and the doctor. The issue of causation here relates not to whether an "additional" or "third party" defendant remained reasonably obscured to plaintiff in making a complex causal connection between masked injury and its source. Instead, the issue of causation relates to which of the possible culprits was the "first" party who caused the known injury. A plaintiff's duty to exercise ordinary diligence incorporates the responsibility to act when, as here, facts suggesting injury, fault, and a small pool of possible suspects are evident. In this case, the causal arrows were pointing in only a few possible directions, and diligence would have identified the correct target or targets. In *Gallagher* and *Mancuso,* we took note that the plaintiffs had already commenced their lawsuits concerning their medical conditions within the statutory limitations periods and only needed to amend their complaints to bring in additional parties. *Gallagher, supra,* 163 *N.J.* at 40–42, 747 *A.*2d 262; *Mancuso, supra,* 163 *N.J.* at 30–32, 747 *A.*2d 255. Those additional claims were asserted soon after the plaintiffs became aware that new facts suggested wrongdoing on the part of another party not yet named in the existing action.

Second, even if defendant-doctor qualifies as a third party, plaintiff had evidence that revealed the doctor's "possible complici-

ty." The standard is not whether complicity is certain, provable, or even probable, but whether fault is possible. *Savage, supra,* 134 *N.J.* at 248, 633 *A.2d* 514. Once the nature of information available to a plaintiff crosses that threshold, we impute knowledge of fault to a plaintiff. The threshold was crossed in this case.

It is not disputed that plaintiff underwent further surgery at the hands of defendant, that her husband continued in his care, and that both of them referred friends and family to defendant. As the Court finds, those facts suggest that for some time plaintiff did not believe defendant had committed malpractice. *Ante* at 250-51, 765 *A.2d* at 189. The inquiry does not end with that finding, however. Discovery-rule doctrine embraces a normative, policy perspective. We objectively inquire not only about what a reasonable plaintiff knew concerning injury and fault, but also what he or she should have known under the circumstances. Under the circumstances of this case, if plaintiff did not know that her doctor possibly could be responsible for her plight, she should have. In other instances, we have held that when a plaintiff is aware of an injury associated with a medical procedure, that knowledge dictates that the plaintiff take steps to investigate whether he or she has any claim against the doctor or any implicated party. *Baird v. American Med. Optics,* 155 *N.J.* 54, 69, 713 *A.2d* 1019 (1998). We do not view the plaintiff's duty to investigate the doctor's possible dereliction as "pitting" the patient against her doctor, but as fulfillment of a plaintiff's duty to act with ordinary diligence when she had the requisite knowledge. The normative aspect of discovery doctrine demands that the nondiligent plaintiff forfeit her claim to the equitable intervention of the discovery rule. As we explained in *Lapka, supra,* 162 *N.J.* at 558, 745 *A.2d* 525, "[b]ecause the discovery rule, at its root, is a rule of equity, we must consider elements of fairness pertaining to all parties, not just to those asserting the benefits of the rule."

In this case, it seems clear to me that as of August 4, 1993, plaintiff unquestionably knew of facts that should have alerted a reasonably diligent claimant that she was injured and that that

injury was caused by the fault of one of three actors, or a combination of two or all three actors. As of August 4, 1993, she knew the rod broke at the screw holes where it was fastened to her bone. She knew breaks were not expected, although possible. She knew the rod might have to be replaced. She knew that her recovery, in any event, would be retarded because the broken rod would not function to assist healing. She knew that there were only three actors in the situation: the doctor, the rod manufacturer, and the therapist. Plaintiff clearly had a basis to pursue those claims from that date forward. Under our discovery-rule jurisprudence, her durational time limit for bringing the action must be measured from that date. Because that date puts plaintiff beyond the limitation period, the statute of limitations should bar her action. I respectfully dissent.

Justice VERNIERO joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, and ZAZZALI—5.

*For affirmance*—VERNIERO and LaVECCHIA—2.