**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4703-17T1

STEVE TABOR and STACY
SCROGGINS, h/w,

     Plaintiffs-Appellants,

v.

JOHNSON & JOHNSON
and ETHICON, INC.,

     Defendants-Respondents.

_____

Argued October 18, 2019 – Decided December 24, 2019

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-0830-14.

Shay S. Deshpande argued the cause for appellants (Franzblau Dratch, attorneys; Shay S. Deshpande, on the brief).

David R. Kott argued the cause for respondents (Riker Danzig Scherer Hyland & Perretti, LLP, and Mc Carter & English, LLP, attorneys for respondents; David R. Kott and Kelly Strange Crawford, of counsel; Jean Paige Patterson, on the brief).

PER CURIAM

In this products liability action, plaintiffs Steve Tabor and his wife, Stacy Scroggins, appeal from orders granting summary judgment to defendants Johnson & Johnson and Ethicon, Inc. (Ethicon), dismissing the complaint on statute of limitations grounds, and denying plaintiffs' cross-motion to extend discovery and compel the deposition of a Johnson & Johnson corporate representative. We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

I.

On February 28, 2014, plaintiffs filed a complaint against defendants alleging that more than three years earlier, on January 6, 2011, "Tabor had a heavy duty polypropylene . . . mesh," manufactured by defendants, "implanted surgically to repair a left inguinal hernia." The complaint further averred that following the surgery, Tabor suffered injuries and pain and suffering due to defects in the mesh. Plaintiffs asserted causes of action under the Product Liability Act (the Act), N.J.S.A. 2A:58C-1 to -11, (counts one and two); common law claims for strict liability (count three); defective design (count four); negligence (count five); breach of express warranty (count six); and a claim defendants violated the New Jersey Consumer Fraud Act (CFA), N.J.S.A.

A-4703-17T1

56:8-1 to -91, (count seven). Scroggins also asserted a cause of action for loss of consortium (count eight).

In February 2018, following the close of fact discovery, defendants moved for summary judgment, asserting plaintiffs' causes of action under the Act; the CFA; and for strict liability, defective design, and negligence were barred by the two-year statute of limitations for personal injury claims. See N.J.S.A. 2A:14-2(a). Defendants argued plaintiffs had reason to know about those claims by as early as May 2011, were required to file the claims by no later than May 2013, and untimely filed the claims in February 2014.

The record is unclear as to the basis for defendants' motion for summary judgment on the breach of express warranty claim because, as defendants acknowledge, the breach of express warranty claim is subject to a four-year limitations period. Thus, even assuming plaintiffs were aware of the alleged breach of express warranty claim in May 2011, the February 2014 complaint was filed within the limitations period applicable to that claim.[1]

---

[1] Defendants' notice of motion was labeled as one seeking summary judgment and dismissal for failure to state a claim, but the body of the notice refers only to the summary judgment rule, R. 4:46, and makes no reference to Rule 4:6-2(e), which governs motions to dismiss for failure to state a claim upon which relief may be granted.

Plaintiffs filed opposition to the summary judgment motion and a cross-motion to extend discovery and compel the deposition of a Johnson & Johnson corporate representative. The court heard argument on the motions and ordered a Lopez[2] hearing to determine when plaintiffs' causes of action accrued. The court also determined that resolution of plaintiffs' cross-motion should abide the outcome of the Lopez hearing.

The Lopez Hearing

Tabor was the only witness presented during the Lopez hearing. He testified he had been employed as a truck driver, his highest level of education was the tenth grade, and he underwent a left inguinal hernia surgery in January 2011 after suffering an injury at work. Dr. Tommy Dinh performed the surgery. Prior to the surgery, Tabor signed a written authorization for a "left inguinal repair with mesh" procedure. The notice included a warning that potential complications included "serious injury or death."

Immediately following the surgery and during the ensuing months, Tabor suffered from severe pain in his groin area and left testicle, and numbing of his legs and lower back. Approximately seven weeks after the procedure, on February 24, 2011, he met with Dr. Dinh for a post-surgical follow-up visit. At

---

[2] Lopez v. Swyer, 62 N.J. 267 (1973).

that time, Tabor did not believe the constant and, at times, severe and unbearable pain he continued to experience was related to the "incisional pain at the site of [his] surgical incision." He testified the pain felt "like someone ha[d] kicked [him] in the groin [twenty-four] hours a day." In February 2011, Tabor began to "wonder" if the surgeon "had done something wrong," and if there was "something wrong" with the mesh. During a March 21, 2011 consultation with Dr. Dinh, Tabor "inferred" that Dr. Dinh opined that Tabor "had possible neuropathy of the inguinal nerve."

Tabor obtained the medical records concerning his surgery from the facility where the procedure was performed and learned the mesh was manufactured by Ethicon. On May 18, 2011, Tabor called Ethicon, spoke to a representative, and "reported experiencing pain and infection one month after a prolene hernia mesh procedure" and "felt something didn't belong there." Tabor also reported that his physician "prescribed antibiotics for infection," and that he felt he was "rejecting the implanted mesh." During the Lopez hearing, Tabor was shown a May 19, 2011 letter from Ethicon to him, describing the report he made to the representative, and he testified that he "believe[d]" and "assum[ed]" he produced the letter during discovery.

A-4703-17T1

Tabor also testified about a June 13, 2011 letter from Ethicon to him that reiterated the May 2011 letter's summary of his conversation with the representative and noted that the May 2011 letter "request[ed] additional information and . . . permission to contact [Tabor's] physician regarding [Tabor's] condition." The June 2011 letter further stated that Ethicon had "attempted to contact [Tabor] via telephone." Tabor testified he did not provide the requested information or permission to contact his physicians "because [he] didn't know what was wrong and [he is] not a doctor."

Tabor testified that one month later, on July 22, 2011, he met with a surgeon, Dr. Ancel Rogers, who told him "that one of the possible causes of [his] pain is irritation of nerves and or surrounding tissues from the implementation of prolene mesh."[3]

During the following months, Tabor met with other healthcare providers concerning his ongoing pain. During his testimony, Tabor agreed that on January 6, 2012, he met with Dr. Rogers, and that Dr. Rogers's medical records from the visit state that Dr. Rogers recommended Tabor undergo a CT scan "to verify whether or not he has a recurrent hernia or some mal-positioning of the

---

[3] In the record, Dr. Rogers' first name is listed variously as "Ansell" and "Ancel." We employ "Ancel" because it is the name used by the trial court in its written decision.

implanted mesh." Tabor, however, testified he could not recall if Dr. Rogers communicated that recommendation to him during the January 6, 2012 visit.

Tabor also testified that on February 20, 2012, he met with Dr. Richard A. Weiner, a pain specialist, whose medical records state that Tabor was "quite concerned that the mesh may have become displaced and that the edges could be poking him internally." Tabor could not, however, confirm that he reported such concerns to Dr. Weiner, and testified that he did not "say [he] did" or "say[] [he] didn't" because he did not recall.

In May 2012, Dr. Rogers performed exploratory surgery. According to Tabor, it was following the surgery that he first "realized the mesh was the problem."

Tabor identified a June 4, 2012 letter addressed to him from a law firm concerning its "undertak[ing] [Tabor's] representation in connection with a lawsuit relating to the mesh" that was surgically implanted during the January 2011 procedure. Tabor testified the letter also stated, "[s]trict time limits do apply and you should take action in regards to your potential claim immediately. Do not delay. At this time you are responsible to the same extent as an attorney to meet all time limits."

A-4703-17T1

Tabor also identified a June 10, 2013 letter from another law firm that was addressed to him and Scroggins concerning an "Ethicon mesh products liability" matter. The letter thanked Tabor and Scroggins for their "inquiry . . . regarding [their] potential legal case against the manufacturers of the Ethicon mesh patch." The letter also stated the law firm would not represent plaintiffs in the matter, advised them to consider obtaining a second opinion, and informed them "there is a limitations period in which [they] must bring [their] claim and or file [their] lawsuit." The letter instructed that if plaintiffs' claims were "not brought within the limitations period, [they] will be forever barred from making such a claim or receiving any compensation." Tabor acknowledged he did not file his lawsuit when he received the letters from the two law firms, but instead waited until February 28, 2014 to do so.

The Court's Decision

The court reserved decision following the Lopez hearing and subsequently issued a detailed written opinion explaining that Tabor is fifty-eight years old, of limited education, and underwent a January 6, 2011, left inguinal hernia repair with mesh that Ethicon manufactured. The court found Tabor experienced pain in the area of the surgery that worsened over the following weeks. Tabor had post-operation consultations with Dr. Dinh on February 24, 2011, and March 21,

2011, and complained of pain at the site of the incision that radiated to his back. Tabor later consulted with Dr. Weiner and again complained of pain related to the surgery.[4]

On May 18, 2011, Tabor called Ethicon and reported he was experiencing pain, and in May and June 2011, he received letters from Ethicon concerning his report and requesting information "to learn more about his problem."

The court further found that on July 22, 2011, Tabor visited Dr. Rogers, who noted that Tabor's pain was "irritation of nerves and/or surrounding tissues from the implantation of Prolene mesh as one of the potential causes." During Tabor's January 6, 2012 visit with Dr. Rogers, the doctor recommended Tabor undergo a CT scan "in an attempt to verify whether or not he has a recurrent hernia or some mal-positioning of the implanted mesh," but Tabor did not have the recommended CT scan. The court found Dr. Weiner's notes from a February 20, 2012 visit with Tabor revealed that Tabor was "quite concerned that the mesh may have become displaced and that the edges could be poking him internally."

The court found Tabor was concerned enough about his condition in June 2012, and again in June 2013, that he consulted with attorneys about his

---

[4] The court's opinion includes a typographical error. The opinion states Tabor visited Dr. Weiner on February 20, 2015, but it is undisputed that Tabor visited with Dr. Weiner three years earlier on February 20, 2012.

potential legal claims and, in each instance, was advised to immediately bring his claims due to the constraints of the statutes of limitations. The court noted Tabor was advised by the law firms that if he failed to timely assert his claims, he would be barred from making his claim.

The court reasoned that despite the information he learned from his physicians and attorneys, Tabor did not file his lawsuit until more than three years after the January 6, 2011 surgery. The court noted the discovery rule tolled the two-year statute of limitations under N.J.S.A. 2A:14-2(a) "until the injured party discovers, or by making reasonable inquiry should have discovered that [the] basis for the cause of action may exist." The court further explained "[t]he decisive question . . . is when [Tabor] discovered or by the exercise of reasonable diligence should have discovered that [his] injuries were causally related to . . . Prolene mesh implanted on January 6, 2011."

The court concluded that Tabor "had very good reason to know of the origin and existence of his injuries shortly after" the surgery, and that his testimony "runs counter to his burden of proof." The court described the immediate and ongoing pain during the weeks immediately following the surgery, Tabor's belief that "something [was] just not right," and his May 2011 phone call to Ethicon. The court determined "[i]t strains credulity to say that

after calling Ethicon to report his pain, [Tabor] had no reason to suspect that the mesh was possibly the cause of his problems." The court concluded Tabor failed to sustain his burden of proof under the discovery rule and determined the complaint was untimely filed.[5] This appeal followed.

II.

Our review of the trial judge's grant of summary judgment is de novo, employing the standard set forth in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998). We must also defer to the trial judge's factual findings based on a testimonial hearing, unless those findings are not supported by substantial credible evidence. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483–84 (1974). In either situation, we owe no deference to a trial judge's interpretation of the law. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A two-year statute of limitations applies to claims for personal injuries. N.J.S.A. 2A:14-2; Giannakopoulos v. Mid State Mall, 438 N.J. Super. 595, 610 (App. Div. 2014). Generally, a cause of action for liability accrues on the date

---

[5] The court's opinion states the complaint was filed on February 20, 2015. It is undisputed, however, that the complaint was actually filed on February 28, 2014.

the alleged tortious act occurred.  Szczuvelek v. Harborside Healthcare Woods Edge, 182 N.J. 275, 281 (2005); see also Beauchamp v. Amedio, 164 N.J. 111, 117 (2000).  When the statute of limitations expires before a plaintiff "[knows] or [has] reason to know that he [or she] has a cause of action against an identifiable defendant . . . the considerations of individual justice and the considerations of repose are in conflict and other factors may fairly be brought into play."  Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 115 (1973).

The discovery rule, which was adopted by our Supreme Court in Fernandi v. Strully, 35 N.J. 434, 450 (1961), delays accrual of a cause of action "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he [or she] may have a basis for an actionable claim."  R.L. v. Voytac, 199 N.J. 285, 299 (2009) (quoting Lopez, 62 N.J. at 272).  "[I]n determining [if] it is appropriate to apply the discovery rule[,] [t]he crucial inquiry is 'whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another.'"  Szczuvelek, 182 N.J. at 281 (quoting Martinez v. Cooper Hosp., 163 N.J. 45, 52 (2000)); accord Caravaggio v. D'Agostini, 166 N.J. 237, 246 (2001).

The standard for determining the application of the discovery rule is "basically an objective one—whether plaintiff 'knew or should have known' of sufficient facts to start the statute of limitations running." Szczuvelek, 182 N.J. at 281 (quoting Martinez, 163 N.J. at 52). It is not necessary that a plaintiff have a provable claim or be aware of facts to suggest that fault is "probable," rather all that is required is that he or she be aware of facts suggesting the "possibility" of wrongdoing. Savage v. Old Bridge-Sayreville Med. Grp., PA, 134 N.J. 241, 248 (1993). Moreover, "legal and medical certainty are not required for a claim to accrue . . . nor does a plaintiff need to understand the legal significance of the facts." Kendall v. Hoffman-La Roche, Inc., 209 N.J. 173, 193 (2012). "In cases in which fault is not self-evident at the time of injury, a plaintiff need only have 'reasonable medical information' that connects an injury with fault to be considered to have the requisite knowledge for the claim to accrue." Ibid.; see Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 437 (1987) (explaining that "medical confirmation" is not required "to have the requisite state of knowledge that would trigger the running of the statute of limitations").

A plaintiff "claiming the indulgence of the [discovery] rule" bears the burden of proving its application is warranted. Lopez, 62 N.J. at 276. A "plaintiff seeking application of the discovery rule" must "establish that a

reasonable person in her [or his] circumstances would not have been aware within the prescribed statutory period that she [or he] was injured through the fault of another." Kendall, 209 N.J. at 194.

Here, the evidence showed that by July 2011, Tabor had "reason to know" the mesh manufactured by Ethicon was a possible cause of his ongoing pain. By that time, he had obtained his surgical records, determined Ethicon manufactured the implanted mesh, and called Ethicon directly to report the pain he experienced following "a prolene hernia mesh procedure." He also reported to Ethicon that he felt he "was rejecting the implanted mesh." As the court noted, Ethicon's representative wrote to Tabor twice asking for access to his doctors and medical records, but Tabor opted not to respond. In addition, during July 2011, Tabor obtained a medical opinion from Dr. Rogers that "one of the possible causes" of his pain "was irritation of nerves or surrounding tissues from the implementation of the prolene mesh."

That evidence alone supports the conclusion that by July 2011, Tabor had reasonable medical information connecting his ongoing pain and other ailments to the mesh sufficient for the asserted causes of action to accrue. See Kendall, 209 N.J. at 193. Indeed, as determined by the motion court, Tabor's May 2011 phone call to Ethicon establishes that he understood the mesh was a possible

cause of his ongoing pain. His understanding was confirmed by Dr. Rogers in July 2011. Thus, although the court did not make a finding as to the precise date plaintiffs' causes of action accrued under the discovery rule, the evidence supports a determination that the date of accrual was no later than Tabor's July 22, 2011 visit with Dr. Rogers.

We reject Tabor's assertion that the causes of action did not accrue until the May 2012 exploratory surgery performed by Dr. Rogers. Plaintiffs argue that, prior to that time, Tabor received equivocal medical advice about whether the mesh was the cause of his pain and did not have reason to know that the mesh was a possible source of his ongoing pain. That argument is not supported by competent record evidence and is otherwise undermined by record.

Tabor's assertion that he received equivocal medical advice about whether the mesh caused his pain is founded on a note in Dr. Weiner's medical records concerning a February 20, 2012 consultation with Tabor. Dr. Weiner's note states Tabor reported that Dr. Rogers told him "there was no hernia or evidence that the mesh was significantly displaced." We note that Tabor did not testify during the Lopez hearing that Dr. Rogers advised him the mesh was not significantly displaced, Dr. Rogers did not testify at the hearing, and plaintiffs do not cite to any medical records from Dr. Rogers indicating that he ever made

15

such a determination or offered such an opinion. More significantly, even if Dr. Rogers actually offered an opinion that the mesh was not significantly displaced, it does not contradict or undermine what he told Tabor in July 2011—that the mesh was a possible cause of his ongoing pain. It was that medical opinion that confirmed what Tabor already believed: the mesh was a possible cause of his claimed post-surgical injuries. See Kendall, 209 N.J. at 193. Plaintiffs' causes of action under the discovery rule accrued no later than July 20, 2011, when that opinion was communicated to Tabor.

Plaintiffs rely on our Supreme Court's decisions in Vispisiano and Caravaggio, and our decision in Graham v. Gielchinsky, 241 N.J. Super. 108 (App. Div. 1990), to support their claim that it was not until the May 21, 2012 exploratory surgery that they had reason to know the mesh was a possible cause of Tabor's alleged injuries. In Vispisiano, the Court considered whether the plaintiff "discovered or should have discovered, by exercise of reasonable diligence and intelligence, that the physical condition of which he complains was causally related to his exposure to chemicals" at a toxic waste site where he had been employed. 107 N.J. at 427. The Court found that despite the plaintiff's suffering from symptoms—migraine headaches—immediately following the commencement of his work at the site, his cause of action did not accrue at that

16

time. Id. at 436. The Court noted the difficulty in applying the discovery rule in toxic tort cases because of the complexity of associating an injury to any one of the vast numbers of chemical compounds to which an individual might be exposed. Id. at 428-29. The Court also noted the plaintiff experienced the same symptoms prior to the commencement of his work at the site and his "physician did not attribute" the symptoms to the chemicals to which he was exposed, but instead attributed them "to other causes." Id. at 432.

The Court relied on "the unusual nature of the toxic tort case," id. at 434, the "difficulty in diagnosing an injury caused by toxic chemicals as well as in discovering the cause of such an injury," id. at 436, and the lack of "some reasonable medical support" connecting the chemicals at the site to the plaintiff's injuries. Id. at 437. There was insufficient evidence establishing the "plaintiff should have known that his exposure to chemicals might have caused his symptoms," id. at 432 (quoting Lopez, 62 N.J. at 276), at the time the trial court determined the causes of action accrued.

Here, Tabor's alleged injuries are not the result of exposure to some unknown and difficult to define chemical or other source. He understood his pain related to the surgical procedure; he almost immediately recognized the mesh might be the source of his pain; and he obtained a medical opinion that

17

one of the possible causes for his ongoing pain was the mesh. Unlike the plaintiff in Vispisiano, Tabor had reason to know both the possible cause of his injuries—the mesh—and the identity of the party allegedly responsible for it—Ethicon.

Similarly, the Court's decision in Caravaggio provides no support for plaintiffs' claim that their causes of action did not accrue until the May 2012 exploratory surgery. In Caravaggio, the plaintiff underwent a surgical procedure during which a rod was placed in her leg. 166 N.J. at 241. The plaintiff subsequently experienced pain in her leg, and the surgeon informed the plaintiff that the rod had broken. 166 N.J. at 241-42. The surgeon performed a second surgery, replaced the rod with another, and provided the original rod to plaintiff to bring to a lawyer. Id. at 242. The lawyer obtained a test of the rod that revealed it had not broken. Id. at 243. Following that disclosure, but more than two years after the original surgery, the plaintiff sued the surgeon for malpractice. Ibid.

The Court found the plaintiff's cause of action against the surgeon accrued when it was determined the rod did not break, thereby exposing the surgeon's alleged malpractice as the cause of the plaintiff's post-surgery injuries. Id. at 205-51. The Court found that, given the surgeon's statements attributing the

plaintiff's pain solely to the broken rod, there was no reason for the plaintiff to suspect any other cause for her post-surgery complications. Ibid. Thus, the Court concluded it was not until the plaintiff learned the rod was not broken that she had reason to know that her post-surgery complications were the result of the surgeon's malpractice. Id. at 252-53.

Unlike the plaintiff in Caravaggio, Tabor was never told his post-surgery complaints were attributed solely to a cause unrelated to the mesh. To the contrary, and as noted, Tabor had reason to know the mesh was a possible cause of his alleged injuries as early as May 18, 2011, when he called Ethicon, and no later than July 20, 2011, when Dr. Rogers advised him the mesh was a possible cause.

Plaintiffs also rely on our decision in Graham, where we held a medical malpractice claim against a surgeon for leaving three wires in the plaintiff's chest during a procedure did not accrue until a subsequent exploratory surgery revealed the presence of the wires. 241 N.J. Super. at 114-15. We reasoned that the nature of the plaintiff's injuries did not permit the plaintiff to ascertain "sufficient facts which equated with a cause of action," id. at 114, and that the defendant surgeon had assured the plaintiff "it is looking good," id. at 115. We concluded that under those circumstances, the equities underlying the discovery

rule required a finding that the cause of action did not accrue until the exploratory surgery first revealed the wires left in the plaintiff's chest during the initial surgery. Ibid.

Again, the circumstances presented here are different. In Graham, the plaintiff had no reason to know that wires were left in his chest and that they caused his post-surgery injuries until the exploratory surgery revealed that to be the case. In contrast, Tabor knew the mesh was implanted, suspected it was a possible cause of his alleged injuries, called the manufacturer of the mesh in May 2011, reported he had been implanted with its mesh and was suffering from pain, and received direct confirmation on July 20, 2011 from Dr. Rogers that the mesh was a possible cause of his injuries.

In sum, the evidence supports the court's finding that plaintiffs' causes of action accrued shortly after the January 6, 2011 surgery. Although the court did not make a finding as to a specific date of accrual, we conclude the causes of action accrued no later than July 20, 2011. As a result, we affirm the court's order granting summary judgment dismissing plaintiffs' claims under the Act; the CFA; and for strict liability, defective design, and negligence, and on

Scroggins claim for loss of consortium.[6] Plaintiffs do not dispute those claims, which were asserted for the first time with the February 28, 2014 filing of the complaint, are subject to the two-year statute of limitations in N.J.S.A. 2A:14-2(a).[7] The court correctly determined they were filed outside of the limitations period.

We are, however, constrained to reverse the court's order granting defendants summary judgment on count six, which asserts a cause of action for breach of express warranty. As noted, and as acknowledged by defendants, that claim is subject to a four-year statute of limitations. See N.J.S.A. 12A:2-725. In its written decision, the court did not address the application of the four-year limitations period to the breach of express warranty claim, but the record requires the conclusion that it was timely filed.

---

[6] As noted, those claims are set forth in counts one, two, three, four, five, seven, and eight of the complaint.

[7] Plaintiffs do not dispute that their common law and CFA claims, other than their breach of express warranty claim, constitute products liability claims under the Act and that the Act provides the exclusive remedy "for [the] harm [allegedly] caused by" the mesh, other than harm suffered from the alleged breach of express warranty. N.J.S.A. 2A:58C:1(b)(3); see also Sinclair v. Merck & Co., Inc., 195 N.J. 51, 66 (2008) (finding the Act "is paramount when the underlying claim is one for harm caused by a product" and CFA claims alleging "harm caused by a product" are claims subject to the Act); DeBenedetto v. Denny's, Inc., 421 N.J. Super. 312, 319 (Law Div. 2010) (holding the Act "is the exclusive remedy for harms caused by a product").

21

In their brief on appeal, defendants claim count six of the complaint fails to state a claim upon which relief may be granted. We do not address the argument because there is no evidence in the appellate record showing it was raised before the motion court, see Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973), or that the motion court addressed or decided that issue. We do not express an opinion on the issue, and defendants are free to move for dismissal on those grounds before the trial court on remand.

We last address plaintiffs' claim the court erred by denying their cross-motion to extend discovery and compel the production of a Johnson & Johnson corporate representative. The cross-motion was argued prior to the Lopez hearing, and the court decided that resolution of the cross-motion would abide the outcome of the Lopez hearing. Following the hearing and its determination that all of plaintiffs' claims were barred by the statute of limitations, the court entered an order denying plaintiffs' cross-motion but offered no reasons for doing so. We assume the court reasonably denied the cross-motion because there was no need for additional discovery or production of a corporate representative for testimony concerning claims that were time-barred.

Our reversal of the court's dismissal of count six, however, requires the court consider and decide the cross-motion on remand. We therefore vacate the

22

court's order denying plaintiffs' cross-motion and remand for the court to consider the motion in light of our reversal of the dismissal of count six. The remand is for the purpose of appropriately allowing the motion court to address the merits of the cross-motion in the first instance, and it does not constitute an opinion on the cross-motion's merits.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION