826 A.2d 700

RAFAELA GUICHARDO, PLAINTIFF-APPELLANT, v. PHILIP RUBINFELD, M.D., RICHARD STILLMAN, M.D., DOVER GENERAL HOSPITAL AND MEDICAL CENTER, JOHN DOE 2-6, FICTITIOUS NAMES REPRESENTING UNKNOWN DEFENDANTS, JANE DOE 1-6 FICTITIOUS NAMES REPRESENTING UNKNOWN DEFENDANTS AND RICHARD ROE 1-6, FICTITIOUS NAMES REPRESENTING UNKNOWN DEFENDANTS, DEFENDANTS, AND MICHAEL DELISI, M.D., DEFENDANT-RESPONDENT.

Argued November 6, 2002—Decided July 16, 2003.

*Ernest P. Fronzuto, III,* argued the cause for appellant (*Piro, Zinna, Cifelli & Paris,* attorneys).

*Melvin Greenberg,* argued the cause for respondent (*Greenberg Dauber Epstein & Tucker,* attorneys; *Louise Arkel,* on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal implicates anew the application of the discovery rule to toll the running of the statute of limitations in a medical malpractice action.

Plaintiff, who was rendered paraplegic in October 1992 by an abscess that compressed her spine, enlisted the aid of three experts, none of whom identified any fault on the part of defendant Dr. Michael DeLisi. She nonetheless continued her investigation and eventually obtained the opinion of a fourth expert, who concluded in July 1995 that Dr. DeLisi's negligent care contributed to plaintiff's paraplegia. Plaintiff amended her complaint in March 1996 to add Dr. DeLisi as a defendant. We must decide whether the discovery rule tolls the two-year statute of limitations for medical malpractice actions, *N.J.S.A.* 2A:14–2, to preserve plaintiff's action against Dr. DeLisi.

The trial court held that the discovery rule tolled the running of the statute of limitations and that plaintiff therefore timely filed her amended complaint naming Dr. DeLisi as a defendant. The Appellate Division reversed, finding that plaintiff had knowledge of facts supporting a claim against Dr. DeLisi prior to receiving her supportive expert's opinion and in fact harbored an early belief that Dr. DeLisi was at fault. We disagree and reverse the Appellate Division.

I

In 1987, plaintiff was involved in an automobile accident that resulted in a condition known as Reflex Sympathetic Dystrophy Syndrome. That condition caused plaintiff to suffer severe pain to the right side of her neck, upper right arm, back, and shoulders. In an attempt to alleviate plaintiff's pain, Dr. Philip Rubinfeld treated plaintiff with a series of thoracic epidural catheterizations.

On September 21, 1992, Dr. DeLisi admitted plaintiff to Dover General Hospital so that Dr. Rubinfeld could perform another catheterization. During that procedure, Dr. Rubinfeld experienced difficulty inserting the catheter and as a result punctured plaintiff's back numerous times. Eventually, another physician, Dr. Robert Lalli, assisted with the insertion. During plaintiff's subsequent four-day hospital stay, the sterile dressing holding her catheter in place remained unchanged despite the appearance of a dark-red drainage on the dressing. On September 25, 1992, the catheter was removed and plaintiff was discharged.

Within a week of her discharge, plaintiff began to experience numbness and tingling from the waist down and difficulty with urination and bowel movements. Dr. DeLisi ordered plaintiff re-admitted to the hospital on October 1, 1992. Dr. Peter Heit, the admitting physician, diagnosed plaintiff with "urinary tract sepsis." Plaintiff remained hospitalized that night and saw Dr. DeLisi on the following morning. At that time, plaintiff informed Dr. DeLisi that she was experiencing tingling, pain, and numbness in her legs. Dr. DeLisi did not diagnose plaintiff that morning.

Dr. DeLisi saw plaintiff again on the morning of October 3. At that time, plaintiff was having problems walking without assistance. Dr. DeLisi examined plaintiff, noticed pus at the site of the epidural catheter, and told her that "[s]omething went wrong with the thoracic epidural." He diagnosed plaintiff with an epidural abscess and ordered her to the operating room for surgery to remove the abscess. The abscess, which was compressing plaintiff's spinal cord, was removed, but plaintiff did not regain the ability to walk.

Several days after plaintiff's surgery, Dr. Rubinfeld visited plaintiff in her hospital room. Plaintiff asked Dr. Rubinfeld whether he did anything wrong that might have caused her paraplegia. Plaintiff alleges that Dr. Rubinfeld responded: "No. But I wished they had called me when you were admitted.... I would have known what went wrong and what steps to take. Things would have been done a lot faster." Following a course of antibiotics, plaintiff was discharged from the hospital on November 2, 1992.

In August 1994, before filing her complaint in the Law Division, plaintiff consulted Mervyn Jeffries, M.D. Dr. Jeffries concluded that plaintiff's health care providers were negligent during the insertion of the catheter, as well as during her first hospital stay in September. Dr. Jeffries did not give an opinion in respect of whether Dr. DeLisi deviated from accepted standards of care.

In September 1994, plaintiff filed a personal injury action against Dover General Hospital, Dr. Rubinfeld, and others involved with plaintiff's care during her September 1992 hospital admission. In December 1994 and April 1995, respectively, plaintiff's attorney consulted with two additional medical experts, Elliot Justin, M.D., and AiHo Kim, M.D. Specifically, plaintiff's attorney inquired of those two experts whether the treatment plaintiff received during her admission in October of 1992 deviated from accepted standards of care, causing her paralysis. Neither expert concluded that Dr. DeLisi or any other post-epidural care provider was negligent. In July 1995, plaintiff's counsel contacted a fourth expert, Richard Hetherington, M.D., who concluded that Dr. DeLisi's delay in diagnosing the epidural abscess was a contributing factor to plaintiff's paraplegia.

Plaintiff amended her complaint in March 1996 to add Dr. DeLisi as a defendant. Dr. DeLisi filed a motion for summary judgment, asserting that plaintiff's amended complaint was time-barred by the statute of limitations. Dr. DeLisi alleged that plaintiff knew of facts sufficient to trigger the running of the statute of limitations in respect of a claim against him as early as

September or October 1992. The trial court granted Dr. DeLisi's motion, stating that plaintiff had sufficient information to alert her that Dr. DeLisi's delay in diagnosing her epidural abscess may have contributed to her paraplegia. The court therefore held that the discovery rule did not apply to toll the running of the statute of limitations. Following dismissal of plaintiff's action against Dr. DeLisi, Dr. Lalli, whom plaintiff had also named as a defendant, retained the services of an expert who concluded that Dr. DeLisi's negligence caused or contributed to plaintiff's paraplegia. Accordingly, Dr. Lalli filed a third-party complaint against Dr. DeLisi.

In February 2000, we decided companion cases, *Mancuso v. Neckles*, 163 *N.J.* 26, 747 *A.*2d 255, and *Gallagher v. Burdette–Tomlin Memorial Hospital*, 163 *N.J.* 38, 747 *A.*2d 262. In those cases, the plaintiffs initially relied on expert advice indicating that third-party physicians were not at fault, but later heard from experts who indicated the contrary. We applied the discovery rule in both cases and permitted the plaintiffs to amend their complaints to name those additional physicians as defendants.

Following our decisions in *Mancuso* and *Gallagher*, plaintiff filed a motion for reconsideration of the trial court's 1997 order granting summary judgment for Dr. DeLisi. In ruling on the motion, the trial court cited *Mancuso* and *Gallagher*, as well as plaintiff's earlier reliance on the opinions of Drs. Jeffries, Justin, and Kim. It concluded that plaintiff reasonably did not become aware of Dr. DeLisi's negligence at the time of her injury and that therefore the statute of limitations for a cause of action against Dr. DeLisi did not begin to run until plaintiff's fourth expert, Dr. Hetherington, provided his opinion to plaintiff. The trial court granted plaintiff's motion for reconsideration and vacated its earlier grant of summary judgment for Dr. DeLisi. It then dismissed Dr. Lalli's third-party complaint against Dr. DeLisi without prejudice to facilitate the filing of this appeal.

The Appellate Division granted Dr. DeLisi leave to appeal. The panel agreed with Dr. DeLisi's argument that plaintiff "was well aware at an early date of the facts supporting her claim against

him." It concluded that plaintiff's "knowledge of the facts and her belief that [Dr. DeLisi] bore some responsibility are sufficient to bar application of the discovery rule." The panel reversed the vacation of summary judgment and remanded the matter for an order dismissing plaintiff's complaint against Dr. DeLisi. This Court granted plaintiff leave to appeal. 172 *N.J.* 174, 796 *A.*2d 891 (2002).

## II

Because it is "inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless," *Lopez v. Swyer,* 62 *N.J.* 267, 274, 300 *A.*2d 563 (1973), New Jersey courts long have employed the equitable principle of the discovery rule to avoid the potentially harsh effects of the "mechanical application" of statutes of limitations. *Vispisiano v. Ashland Chem. Co.,* 107 *N.J.* 416, 426, 527 *A.*2d 66 (1987). The discovery rule delays accrual of a cause of action "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered[,] that [he or she] may have a basis for an actionable claim." *Lopez, supra,* 62 *N.J.* at 272, 300 *A.*2d 563. To start the statute of limitations running in a case involving "complex medical causation," in which "it is not at all self-evident that the cause of injury was 'the fault of ... a third party,'" *Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255 (quoting *Vispisiano, supra,* 107 *N.J.* at 434, 527 *A.*2d 66), "more is required than mere speculation or an uninformed guess 'without some reasonable medical support' that there was a causal connection" between the plaintiff's condition and the third party's conduct. *Ibid.* (quoting *Vispisiano, supra,* 107 *N.J.* at 437, 527 *A.*2d 66).

Although the discovery rule does not require "knowledge of a specific basis for legal liability or a provable cause of action," it does require "knowledge not only of the injury but also that another is at fault." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.,* 163 *N.J.* 45, 52, 747 *A.*2d 266 (2000) (citations omitted). Accord-

ingly, plaintiffs who seek application of the discovery rule may be "divided into two classes: those who do not know that they have been injured and those who know they have suffered an injury but do not know that it is attributable to the fault of another. A cause of action does not accrue until both of those factors exist." *Id.* at 53, 747 *A.2d* 266. This Court also has distinguished a "sub-category" of that second genre of "knowledge of fault" cases, which includes actions brought by plaintiffs who "know[ ] [they have] been injured and [that] the injury was the fault of another, but do[ ] not know that a third party was also responsible for [their] plight." *Id.* at 54, 747 *A.2d* 266.

"[W]hen a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty to act." *Caravaggio v. D'Agostini,* 166 *N.J.* 237, 249–50, 765 *A.2d* 182 (2001). However, when that plaintiff reasonably remains unaware that an additional third party also may be at fault, "the accrual clock does not begin ticking against the third party until the plaintiff has evidence that reveals [the third party's] possible complicity." *Id.* at 250, 765 *A.2d* 182. In the two recent decisions factually analogous to the instant appeal, *Mancuso, supra,* and *Gallagher, supra,* this Court permitted the plaintiffs to amend their complaints to name additional physicians as defendants more than two years subsequent to the dates they sustained their injuries. In both cases, the plaintiffs had relied on earlier expert opinions indicating that the additional physicians were not at fault.

In *Mancuso, supra,* we held that "when a patient has relied on competent expert advice that one or more of her treating physicians did not contribute to the patient's injuries, later assertions to the contrary by a competent expert would then provide the 'basis for an actionable claim.'" 163 *N.J.* at 37, 747 *A.2d* 255 (quoting *Lopez, supra,* 62 *N.J.* at 272, 300 *A.2d* 563). The plaintiff in *Mancuso* was a breast cancer victim whose cancer remained undiscovered for three years after her radiologist erroneously diagnosed a cyst in her breast as benign. *Id.* at 30, 747 *A.2d* 255. An expert retained by the plaintiff alleged that the plaintiff's

surgeon was negligent, but did not indicate any fault on the part of the plaintiff's radiologist. *Id.* at 32, 747 *A.*2d 255. We held that until the production of a defense expert's report indicating fault on the part of the radiologist, the "nature of the information" possessed by the plaintiff did not suggest that the spread of her breast cancer might have been due to the radiologist's negligence. *Id.* at 35, 747 *A.*2d 255. Thus, we found that "the 'quality of the requisite state of mind' that she possessed appeared blameless." *Ibid.* The plaintiff "did not suspect, much less have reason to believe, that she may have been injured by the conduct of [the radiologist]." *Ibid.* Accordingly, we applied the discovery rule to preserve the plaintiff's claims against the radiologist.

In *Gallagher, supra,* the plaintiff was rendered completely incontinent by surgery intended to correct an incontinence problem. The plaintiff timely filed suit against the hospital, the surgical team, and various fictitious defendants, but failed to name her after-care physicians as defendants. 163 *N.J.* at 41, 747 *A.*2d 262. Several years after she sustained her injuries, plaintiff was alerted, through the deposition of a defense expert, that her after-care urologists may have been responsible for her injuries. *Id.* at 42, 747 *A.*2d 262. Until that time, she had relied on her own experts' reports that did not indicate any malpractice on the part of those individuals. *Id.* at 41, 747 *A.*2d 262. Applying the discovery rule analysis set forth in *Mancuso,* we concluded that the plaintiff "had no reasonable basis to suspect that her crippling condition was caused by anything other than the original surgery . . .," that the plaintiff exercised " 'reasonable diligence and intelligence' in asserting her claim . . .," and that there was "[n]o readily apparent indication of [the after-care urologists'] potential contribution to the patient's medical deterioration . . . until [a defense expert] brought the failure to treat plaintiff's infection to light." *Id.* at 41, 44, 747 *A.*2d 262 (quoting *Lopez, supra,* 62 *N.J.* at 272, 300 *A.*2d 563). Accordingly, we applied the discovery rule to preserve the plaintiff's claims.

III

■ Dr. DeLisi contends that the discovery rule should not apply because plaintiff knew or reasonably should have known that she had a basis for a claim against him at the time of her injury or shortly thereafter. In support of that assertion, he cites portions of plaintiff's answers to Dr. Rubinfeld's interrogatories, including allegations that "medical personnel failed to properly diagnose [her] injuries [and] failed to take effective measures and to provide timely medical treatment," as well as statements that indicate her knowledge of the chronology of her care during her October admission and Dr. DeLisi's role in providing that care. We note, however, that plaintiff provided those interrogatory answers in July 1995, the same month that Dr. Hetherington supplied plaintiff with his expert opinion that Dr. DeLisi deviated from accepted standards of care. Dr. DeLisi provides no basis for concluding that plaintiff had support for her assertions independent of Dr. Hetherington's report.

Dr. DeLisi also cites Dr. Rubinfeld's statements that had he been called when plaintiff was admitted to the hospital in October, he "would have known what went wrong and what steps to take," and "[t]hings would have been done a lot faster," as evidence that plaintiff knew or reasonably should have known of the existence of her claim against Dr. DeLisi. Although Dr. Rubinfeld's comments may suggest obliquely that Dr. DeLisi's delay in ordering surgery may have contributed to plaintiff's paraplegia, his statements are too vague and self-serving to constitute "reasonable medical support" for a claim against Dr. DeLisi. *Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255. At most, Dr. Rubinfeld's statement imposed on plaintiff a "duty to act," that is, to investigate whether there might be a cause of action against any of her after-care providers. *Caravaggio, supra,* 166 *N.J.* at 250, 765 *A.*2d 182. She fulfilled that duty, as evidenced by her consultation with numerous experts and her specific inquiries in respect of whether the care she received during her October 1992 hospital admission deviated from accepted standards. Plaintiff was not "dilatory." *Mancuso, su-*

*pra*, 163 *N.J.* at 36, 747 *A.*2d 255. As in *Mancuso* and *Gallagher*, plaintiff reasonably relied on earlier expert advice indicating an absence of fault on the part of a particular defendant. Accordingly, we do not find that plaintiff knew or reasonably should have known of the existence of her claim against Dr. DeLisi.

In deciding whether to apply the discovery rule, we also must consider whether Dr. DeLisi has been "unfairly prejudiced." *Id.* at 37, 747 *A.*2d 255 (citing *Lopez, supra*, 62 *N.J.* at 276, 300 *A.*2d 563). As a third-party defendant impleaded by Dr. Lalli, Dr. DeLisi has been an active participant in this case, represented by counsel, for nearly five years. He is already conversant with the facts and issues that would be litigated by plaintiff and has participated in discovery and depositions. Dr. DeLisi has not suggested that the passage of time has made any evidence or witnesses unavailable. We therefore conclude that Dr. DeLisi is not prejudiced by application of the discovery rule in this appeal.

In view of plaintiff's reasonable reliance on the expert advice she received prior to consulting with Dr. Hetherington, as well as the absence of undue prejudice to Dr. DeLisi, we conclude that the discovery rule applies to preserve plaintiff's claim. We add only our disagreement with the dissent's conclusion that our decision endorses an open-ended process that allows a plaintiff an indefinite period in which to search for an expert willing to support a preferred theory of liability. First, in this appeal, as in *Mancuso* and *Gallagher*, plaintiff reasonably relied on expert advice indicating an absence of fault on the part of a particular care provider. In the majority of medical malpractice cases, such detrimental reliance is unlikely. Second, when, as in this appeal, litigation against other defendants already is in progress, the time limitations prescribed in our court rules will serve to limit a plaintiff's ability to continue the search for a supportive expert. When no litigation is pending, the discovery rule's inquiry into diligence by the plaintiff and prejudice to the defendant will accomplish the same objective. Finally, the discovery rule is a doctrine of equity and there is nothing in our jurisprudence that would bar the

application of other equitable principles such as unclean hands or laches to avoid undue prejudice to a potential defendant.

## IV

We reverse the Appellate Division and remand the matter to the Law Division to reinstate the June 2000 order that vacated the 1997 summary judgment order in favor of Dr. DeLisi.

VERNIERO, J., dissenting.

The Court essentially holds that, in a multi-defendant medical malpractice case, a cause of action does not accrue in respect of a particular defendant until the plaintiff has in hand an expert opinion informing him or her of the supposed negligence of that defendant. That never has been and should not be our law. Moreover, despite the majority's attempt to limit its holding, there is nothing to prevent future litigants from importing the Court's rationale to single-defendant cases. And, I predict, lower courts will have little choice but to submit to that rationale, the result being that receipt of an expert report soon will develop as the triggering mechanism in all medical malpractice actions. I believe that the Legislature, not this Court, should be the body to effect such a dramatic revision to the statute of limitations. Accordingly, I respectfully dissent.

My analysis begins, as it must, with the text of *N.J.S.A.* 2A:14-2. The statute states: "Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this state shall be commenced within 2 years next after the cause of any such action shall have accrued." *Ibid.* The discovery rule is a tool of equity that helps determine an action's accrual date. The rule provides that "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer*, 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973).

New Jersey's adoption of the discovery rule traces to *Fernandi v. Strully*, 35 *N.J.* 434, 173 *A.*2d 277 (1961). In that case, the plaintiff had undergone surgery in 1955, but did not discover until 1958 that her surgeon negligently had left a wing nut in her abdomen. The wing nut had caused the plaintiff great discomfort, prompting her to commence a medical malpractice action more than two years after the date of her surgery. In permitting the suit to go forward, this Court explained that the plaintiff's injury belonged to a "special grouping" of cases in which "the period of limitations may and should fairly and justly be said to begin to run when the plaintiff knows or has any reason to know about the foreign object and the existence of the cause of action based upon its presence[.]" *Id.* at 450, 173 *A.*2d 277.

The discovery rule has been extended beyond the special grouping of cases involving medical instruments negligently left in the body. Since the late 1960s, the rule has been applied to surveyor liability claims, *New Market Poultry Farms, Inc. v. Fellows*, 51 *N.J.* 419, 241 *A.*2d 633 (1968), replevin actions, *O'Keeffe v. Snyder*, 83 *N.J.* 478, 416 *A.*2d 862 (1980), and legal malpractice claims, *Grunwald v. Bronkesh*, 131 *N.J.* 483, 621 *A.*2d 459 (1993), among others. Throughout the development of our jurisprudence, however, the Court has adhered faithfully to the concept that "[b]ecause the discovery rule, at its root, is a rule of equity, we must consider elements of fairness pertaining to all parties, not just to those asserting the benefits of the rule." *Lapka v. Porter Hayden Co.*, 162 *N.J.* 545, 558, 745 *A.*2d 525 (2000).

In other words,

[e]nforcement of statutes of limitations is the general rule, and discovery doctrine, as a tool of equity, is designed as an exception to that general rule. The essential purpose of the discovery rule "is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations." *Vispisiano v. Ashland Chem. Co.*, 107 *N.J.* 416, 426, 527 *A.*2d 66 (1987). When a statute of limitations operates as it should to cut off a cause of action, that does not necessarily constitute a "harsh result." That is the very nature of a limitation of actions[.]

[*Caravaggio v. D'Agostini*, 166 *N.J.* 237, 253–54, 765 *A.*2d 182 (2001) (LaVecchia, J., dissenting).]

Applying the discovery rule to toll the statute in this case is to detach the rule from its original moorings. On October 2, 1992, Dr. DeLisi examined plaintiff and ordered a catheterization. The next day the doctor diagnosed an abscess at the catheter site and ordered surgery. In answers to interrogatories, plaintiff has acknowledged that sometime in October 1992 after the surgery, another physician, Dr. Rubinfeld, told plaintiff, "I wish[ ] they had called me, when you were admitted [to the hospital]." When plaintiff asked the doctor why he should have been called, he responded, "because I would have known what went wrong and what steps to take. Things would have been done a lot faster."

In August 1994, nearly two years after her conversation with Dr. Rubinfeld, plaintiff consulted with an expert who concluded that her healthcare providers had been negligent during the insertion of the catheter. The expert did not give an opinion in respect of Dr. DeLisi's purported negligence. In September 1994, plaintiff filed suit against named and fictitious defendants, but not against Dr. DeLisi. During the remainder of 1994 through July 1995, plaintiff consulted with three additional experts, the last of whom expressed the view that Dr. DeLisi's alleged delay in diagnosis may have contributed to plaintiff's injury. In March 1996, plaintiff amended her complaint to add the doctor as defendant. That amendment was filed about three and one-half years from both the date of Dr. DeLisi's diagnosis and plaintiff's conversation with Dr. Rubinfeld.

I am satisfied that plaintiff's cause of action in respect of Dr. DeLisi accrued sometime in October 1992 on the basis of Dr. Rubinfeld's statement that he "would have known what went wrong and what steps to take" had plaintiff consulted him earlier. That statement provided plaintiff with an "awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct [*i.e.*, Dr. DeLisi] *may* have caused or contributed to the cause of the injury and that [the] conduct itself might possibly have been unreasonable or lacking in due care."

*Savage v. Old Bridge–Sayreville Medical Group,* 134 *N.J.* 241, 248, 633 *A.*2d 514 (1993).

Inexplicably, plaintiff waited nearly two years from Dr. Rubinfeld's statement before even beginning the process of consulting experts for the purpose of filing suit. The Court acknowledges that "Dr. Rubinfeld's statement imposed on plaintiff a 'duty to act[.]' " *Ante* at 54, 826 *A.*2d at 706. It concludes, however, that she satisfied that duty. I cannot join the majority's conclusion that such delay is consistent with the type of diligent inquiry required in these circumstances. By my reading of the record, plaintiff "had an obligation to investigate all potentially responsible parties in a timely manner but did not do so." *Matynska v. Fried,* 175 *N.J.* 51, 53, 811 *A.*2d 456 (2002).

The majority relies heavily on *Mancuso v. Neckles,* 163 *N.J.* 26, 747 *A.*2d 255 (2000), and *Gallagher v. Burdette–Tomlin Mem'l Hosp.,* 163 *N.J.* 38, 747 *A.*2d 262 (2000). In *Mancuso, supra,* the plaintiff was unaware that the spread of her cancer might have resulted from an erroneous reading, years earlier, of a mammogram by a physician, Dr. Beinart. "In fact, two sets of medical professionals had confirmed that Dr. Beinart's initial diagnosis of a benign cyst in [the plaintiff's] right breast was correct." 163 *N.J.* at 35, 747 *A.*2d 255. Relying on those experts, the plaintiff initially filed a timely complaint without naming Dr. Beinart as a defendant. Later, when an expert retained by one of the existing defendants suggested fault on Dr. Beinart's part, the plaintiff sought to include that doctor in the suit. We permitted the suit against that doctor to proceed, explaining that the plaintiff "did not suspect, much less have reason to believe, that she may have been injured by the conduct of Dr. Beinart." *Ibid.*

In *Gallagher, supra,* the plaintiff suffered "a post-operative infection that developed into an abdominal abscess due to the lack of timely antibiotic therapy." 163 *N.J.* at 40, 747 *A.*2d 262. The plaintiff's after-care physicians were not those who had performed the actual surgery. The plaintiff did not amend her complaint to include the after-care physicians until two years after she had filed

it against the surgical team. We permitted that amendment under the discovery rule, finding that the patient "had no reasonable basis to suspect that her crippling condition was caused by anything other than the original surgery." *Id.* at 43, 747 *A.*2d 262.

Unlike the majority, I do not consider the facts in this case to be analogous to those found in *Mancuso* and *Gallagher.* Here, plaintiff did not rely on numerous expert opinions exonerating Dr. DeLisi, but rather continued to believe that he bore some responsibility for her tragic condition. As the Appellate Division stated, "[i]ndeed, it was this belief that led her to shop for a physician to support her claim of malpractice and to consult four experts regarding his potential liability." Had she acted on that belief sooner, rather than wait two years before consulting her first expert, her complaint could have been filed in a timely fashion consistent with prior case law.

As significant, unlike the situations in *Mancuso* and *Gallagher,* neither the identity of Dr. DeLisi nor his purported conduct was "unclear" or "masked." *Gallagher, supra,* 163 *N.J.* at 43, 747 *A.*2d 262 (internal quotation marks and citation omitted). Instead, he was one of a small universe of practitioners who had treated plaintiff during the short period within which the alleged actionable conduct had occurred. I thus am persuaded that the Appellate Division concluded correctly that "[h]ere, knowledge of the facts and [plaintiff's] belief that [Dr. DeLisi] bore some responsibility are sufficient to bar application of the discovery rule."

The majority's contrary conclusion implicates the future of the discovery rule. Not long ago this Court stated firmly: "We impute discovery if the plaintiff is aware of facts that would alert a reasonable person to the *possibility* of an actionable claim; medical or legal certainty is not required." *Lapka, supra,* 162 *N.J.* at 555–56, 745 *A.*2d 525 (emphasis added). That statement was based on settled case law, which instructs litigants that "[t]he proofs [necessary to commence the limitations period] need not evoke a finding that plaintiff knew for a certainty that the factual basis [for a claim] was present. It is enough that plaintiff had or

should have discovered that he 'may have' a basis for the claim." *Burd v. New Jersey Tel. Co.*, 76 *N.J.* 284, 293, 386 *A.2d* 1310 (1978) (citation omitted). Such observations lose much of their currency in view of today's holding.

It now appears that a claimant who waits nearly two years before consulting his or her *first* expert will be viewed as acting promptly, although the identity of the doctor against whom recovery is sought and his conduct previously were known to the claimant. Moreover, until a claimant secures a definitive expert opinion that one among a number of physicians is at fault, then the cause of action insofar as that one physician is concerned might not accrue. The Court has traveled far from those special grouping of cases in which it intended application of the discovery doctrine to be a narrow exception to the strict enforcement of statutes of limitations.

I hold no brief for doctors who commit malpractice. As indicated, however, "the principal consideration underlying [the] enactment [of statutes of limitations] is one of fairness to the defendant." *Lopez, supra,* 62 *N.J.* at 274, 300 *A.2d* 563. With that consideration in mind, I observe that Dr. DeLisi now will be forced to defend conduct as a primary defendant that allegedly occurred in 1992. He will continue to list this suit when he applies for hospital privileges, renews his malpractice insurance, and conducts other transactions in which disclosure of litigation is required. When is this defendant entitled to repose? The Court's answer, it seems, is not yet.

In sum, I cannot join in what I consider to be the majority's lax enforcement of the statute of limitations and an erroneous application of the discovery rule. If the circumstances of this case argue for changes in New Jersey's limitations law, those changes should originate from the elected branches, not from this Court. We once considered the discovery doctrine to be a necessary but narrow exception to the statute of limitations. Under the Court's approach, that exception has swallowed up a large part of the rule, with open-ended litigation likely to follow as the norm. The Court

should not travel down this path. Instead, it should affirm the judgment of the Appellate Division.

Justices COLEMAN and LaVECCHIA join this opinion.

*For reversing and remanding*—Chief Justice PORITZ and Justices LONG, ZAZZALI, and ALBIN—4.

*For affirming*—Justices VERNIERO, COLEMAN and LaVECCHIA—3.