865 A.2d 636

STEPHEN SZCZUVELEK, GENERAL ADMINISTRATOR OF THE ESTATE OF EUGENE BURNS, PLAINTIFF–APPELLANT, v. HARBORSIDE HEALTHCARE WOODS EDGE, T/A HARBORSIDE NURSING HOME AND SOMERSET MEDICAL CENTER, A DULY INCORPORATED PRIVATE HOSPITAL FACILITY, DEFENDANTS–RESPONDENTS, AND BARRY FREEMAN, M.D., JOHN DOE, FICTITIOUS NAME AND ROBERT ROE, FICTITIOUS NAME, DEFENDANTS.

Argued September 13, 2004—Decided January 24, 2005.

276

George W. Conk argued the cause for appellant (*Tulipan & Conk* and *Larry L. Leifer*, attorneys).

*Raymond J. Fleming* argued the cause for respondent Somerset Medical Center (*Sachs, Maitlin, Fleming & Greene*, attorneys).

*Francine M. Chillemi* argued the cause for respondent HHCI Limited Partnership d/b/a Harborside Healthcare–Woods Edge improperly pled as Harborside Healthcare Woods Edge t/a Harborside Nursing Home (*Monte, Sachs & Rudolph*, attorneys).

PER CURIAM.

The members of the Court being equally divided on the issue of the timeliness of the filing of plaintiff's complaint against Harborside Healthcare Woods Edge t/a Harborside Nursing Home (Harborside), the judgment of the Appellate Division is affirmed in respect of that defendant.

The Court is unanimous that it was error to enter judgment dismissing the complaint against Somerset Medical Center (Somerset) and remands the matter to the trial court for further consideration.

I.

The facts are these. In February 1999, Eugene Burns was admitted to the Robert Wood Johnson Hospital in New Brunswick for treatment of an aneurysm. During a surgical procedure, a tracheotomy tube was inserted into Burns' throat. Thereafter, he was unable to speak, but he could communicate by writing on a pad. Burns was treated at Robert Wood Johnson for approximately two months following his operation. On April 13, 1999, he was transferred to Harborside for rehabilitation. The medical order issued by Robert Wood Johnson directed that Burns should

be suctioned [1] every four hours. Harborside issued its own order on April 14, 1999, requiring healthcare personnel to "suction Q shift and PRN." (Q means once per shift three shifts per day, and PRN means as needed).

Stephen Szczuvelek (plaintiff), a close friend of Burns, visited him at Harborside on April 15, 1999. During plaintiff's visit, Burns wrote him a note stating, "Steve, you have to get me out of here. They're going to kill me. They left me in my own waste for three hours. They won't suction me. Please get me out of here. And I need to be suctioned now."

Plaintiff pressed the nurse's call button to obtain help for Burns, but he did not receive a response. After waiting an hour, plaintiff left Burns' room to seek help. He found a nurse, who took plaintiff to a conference room to speak with a social worker. After plaintiff gave Burns' note to the nurse and the social worker, they assured him that someone would assist Burns.

Upon his return to Burns' room, plaintiff asked the nurse on duty if she would suction Burns. The nurse responded, "I just did." Burns then shook his head indicating that the nurse had not suctioned him. Plaintiff confronted the nurse, "Ma'am, I've been here almost two hours and you haven't stepped foot in this room." She responded, "it's the doctor's orders, he's not to be suctioned." Upon further prodding from plaintiff to suction Burns the nurse said, "I don't have to take this crap," and left the room. Plaintiff departed Harborside that evening concerned for Burns' health and determined to find an alternative placement for him.

The following day, April 16, 1999, Burns was rushed to Somerset because he was unresponsive. Plaintiff visited Burns in the Somerset emergency room. He observed Burns' poor medical condition and believed that Burns was dying. Burns seemed terrified and lapsed in and out of consciousness. A doctor told

---

[1] Suctioning involves the removal of trachea-bronchial secretion by using a catheter and a suctioning machine. The suctioning helps to stimulate the patient to cough up additional secretions.

plaintiff that Burns would not survive an operation and that the hospital would make Burns "as comfortable as possible."

While he was in the emergency room, a nurse informed plaintiff that Harborside had not suctioned Burns because there was a fire drill the prior evening. Later, the social worker at Harborside denied that any fire drill had occurred.

At some point a Somerset doctor asked plaintiff why Burns was not transferred to Robert Wood Johnson. Plaintiff indicated to the doctor that he had not participated in the decision to transfer Burns to Somerset. Apparently, the doctor was concerned because Burns had previously been treated at Robert Wood Johnson and his medical records were there.

On April 17, 1999, Burns suffered a heart attack brought on by respiratory complications and died a short while later. Burns was buried on April 20, 1999.

Approximately three weeks after Burns' funeral, plaintiff consulted with David Alperts, Esq. because he suspected that something went wrong with Burns' medical care. Mr. Alperts directed plaintiff to obtain Burns' medical records from Harborside and Somerset. Plaintiff obtained those records that evidenced that the medical care Burns received at Harborside had contributed to his death.

Approximately six months after the funeral, plaintiff contacted a state agency to file a complaint against Harborside and urged an investigation into the events of April 15, 1999. The status of that complaint and investigation is unknown. On August 31, 2000, plaintiff consulted another attorney, Larry L. Leifer, Esq.

Plaintiff filed this lawsuit against Harborside and Somerset on April 26, 2001, two years and nine days after Burns' death. Plaintiff asserted in his complaint various claims pursuant to the Survivor Act, *N.J.S.A.* 2A:15–3, including medical malpractice. Later, on June 24, 2001, plaintiff received a report from Dr. Warren D. Widmann, a medical expert, concluding that Burns had

lapsed into a coma and died as a result of inadequate medical care by Harborside and Somerset.

Plaintiff filed an amended complaint on July 9, 2002, to allege a cause of action pursuant to the New Jersey Nursing Home Responsibilities and Rights of Residence Act, *N.J.S.A.* 30:13–5(J), and the Nursing Home Reform Act, "42 *U.S.C.* 483.25 et seq.," including provisions contained in 42 *C.F.R.* 488.410 and 42 *C.F.R.* 488.301.

Defendants Harborside and Somerset separately moved for summary judgment, asserting that plaintiff filed his complaint beyond the two-year statute of limitations period. In opposition to the motions, plaintiff certified that approximately three weeks after Burns' funeral he met with an attorney who instructed him to obtain the medical records from Harborside and Somerset. He did so and began to conceptualize that Burns' death might have been caused by negligence at Harborside. Plaintiff certified that it was not until he consulted Larry Leifer, Esq., on August 31, 2000, in furtherance of his complaint against Harborside that he realized Somerset may also have been negligent. Plaintiff argued that his actions filed on April 26, 2001, were timely because it was not until three weeks after Burns' funeral on April 20, 1999, that he contacted counsel and thereafter became aware or should have been aware of Harborside's negligence, and even later for the negligence of Somerset. The trial court canvassed the case law, noting that the statute of limitations begins to run when the plaintiff is aware or reasonably should be aware of facts of an injury through the fault of another. The court granted each defendant's motion, but in the course of its letter opinion directly addressed only the circumstances involving Harborside and did not discuss the facts as they related to Somerset. The court concluded that based on Burns' April 15 note to plaintiff and plaintiff's observations that same day, along with the cause of the decedent's death (respiratory complications), plaintiff knew or should have known that Harborside's actions or lack thereof were actionable at that time.

The Appellate Division agreed with the trial court and affirmed substantially for the reasons articulated in the trial court's letter opinion of October 4, 2002.

## II.

The statute of limitations sets forth the period of time within which a party may file a complaint. In the case of a medical malpractice claim, suit must be filed within two years of the accrual date, which generally is the date of the negligent act or omission. *Martinez v. Cooper Hosp.*, 163 *N.J.* 45, 52, 747 *A.*2d 266 (2000). To avoid the harsh effects of a mechanical application of statute of limitations, we adopted the discovery rule first announced in *Fernandi v. Strully*, 35 *N.J.* 434, 173 *A.*2d 277 (1961). *Ibid.* "The discovery rule is essentially a rule of equity." *Lopez v. Swyer*, 62 *N.J.* 267, 273, 300 *A.*2d 563 (1973). The rule "provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he [or she] may have a basis for an actionable claim." *Id.* at 272, 300 *A.*2d 563.

> It is not every belated discovery that will justify an application of the rule lifting the bar of the limitations statute. The interplay of the conflicting interests of the competing parties must be considered. The decision requires more than a simple factual determination; it should be made by a judge and by a judge conscious of the equitable nature of the issue before him [or her].
>
> [*Id.* at 275, 300 *A.*2d 563.]

Thus, it is necessary to identify the equitable claims of each party and evaluate and weigh those claims in determining whether it is appropriate to apply the discovery rule. The crucial inquiry is "whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another. The standard is basically an objective one— whether plaintiff 'knew or should have known' of sufficient facts to start the statute of limitations running." *Martinez, supra,* 163 *N.J.* at 52, 747 *A.*2d 266.

## III.

██ We turn now to apply those principles to the parties' contentions. Plaintiff contends that a fair application of the discovery rule results in a conclusion that the cause of action did not accrue until after he consulted with counsel, obtained the medical records, and realized Harborside may have been negligent in its treatment of Burns. Further, he contends that the misleading advice he received on April 15, 1999, by the nursing staff at Harborside that Burns was receiving respiratory care as often as permitted by the physician's orders should toll the running of the statute of limitations until "June 24, 2001 or shortly thereafter, when he had the benefit of the report of Dr. Warren D. Widmann." Plaintiff alleges that Dr. Widmann's report provided the factual basis to conclude that Harborside and its staff had been negligent. Moreover, it was not until he received Dr. Widmann's report that he had a factual basis to appreciate that Somerset may have been negligent for its failure to diagnose and properly treat Burns.

Harborside contends there is no justification to apply the discovery rule in this case. Further, it argues that it is disingenuous of plaintiff to now argue that he did not have sufficient facts to file this lawsuit until he obtained Dr. Widmann's report in June 2001 since he filed the complaint on April 26, 2001, prior to the receipt of that report.

Somerset also argues that this is not an appropriate case to apply the discovery rule because plaintiff observed a lack of suctioning of Burns on April 15, 1999, Burns' death occurred on April 17, 1999, and plaintiff consulted with a lawyer within three weeks of the funeral, which evidenced his obvious concern.

██ Unlike the claim against Harborside, the trial court made no findings on the record that would indicate when a reasonable person in plaintiff's position should have been aware of Somerset's role in contributing to the cause of Burns' death. The court below failed to discuss the application of the discovery rule to Somerset

and to determine when plaintiff should have reasonably known of facts supporting a cause of action against Somerset to start the running of the statute of limitation.

The application of the discovery rule may result in different dates for the accrual of a cause of action against different parties. As noted above, the discovery rule delays accrual of a cause of action "until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that [he or she] may have a basis for an actionable claim." *Lopez* supra, 62 *N.J.* at 272, 300 *A.*2d 563.

Plaintiff certified that he did not have any knowledge of possible negligence by Somerset until he contacted Mr. Leifer on August 31, 2000. We note, however, that we have an incomplete record as the parties failed to submit to us a statement of material facts, which is required on the filing of a motion for summary judgment, that could have enabled us to decide this issue. Consequently, a remand is necessary for the trial court to determine the application of the discovery rule as to Somerset and when the cause of action arose against Somerset.

In summary, the members of the Court being equally divided, the judgment dismissing the complaint against Harborside is affirmed. The matter is remanded for the trial court to determine when the cause of action arose against Somerset.

PORITZ, C.J., WALLACE, J., and RIVERA–SOTO, J., concurring.

We would affirm the judgment of the Appellate Division granting summary judgment in favor of Harborside based on our concurrence with the trial court's conclusion that plaintiff exceeded the statute of limitations time period for filing his complaint against Harborside.

We agree with the trial court and the Appellate Division that applying the objective standard of what a reasonable person knew or should have known from the surrounding facts, *Martinez v.*

*Cooper Hosp.*, 163 *N.J.* 45, 52, 747 *A.*2d 266 (2000), plaintiff provided no adequate basis for the application of the discovery rule to save his complaint against Harborside. In rendering its decision, the trial court stated:

> Here, Burns had trouble breathing on April 15, 1999, possibly stemming from the tracheotomy tube and it not being suctioned. This was told to plaintiff and plaintiff read Burns' note and made his own observations. Plaintiff knew of defendant's cause of death, heart attack brought on by respiratory complications. Plaintiff knew or should have known that Harborside's actions or lack thereof was actionable at that time. Clearly, plaintiff's claim that he did not know a cause of action accrued until he talked to David Alperts or his present counsel is insufficient as a matter of law to toll the statute of limitations.

Before us, plaintiff also urges that he was misled by the nursing staff at Harborside on April 15, 1999, when he was told that Burns was receiving respiratory care as often as permitted by the physician's orders. We *would* reject that claim.

In his deposition, plaintiff stated that prior to that conversation, plaintiff asked the nurse on duty if she would suction Burns and the nurse replied, "I just did." After Burns shook his head, plaintiff challenged the nurse's comment. It was then that the nurse changed her view and claimed it was the doctor's orders that Burns was not to be suctioned.

We are satisfied that a reasonable person in plaintiff's position would have been concerned whether Burns received proper care and whether Harborside's treatment, or lack thereof, contributed to Burns' death. According to plaintiff, the nurse's assertion that she was following the doctor's orders not to suction Burns contradicted her prior statement that she had just suctioned Burns. That glaring contradiction, standing alone would make any reasonable person suspicious. Indeed, the conduct of the nurses and their treatment of Burns prompted plaintiff to immediately seek to transfer his friend to another facility. Unfortunately, time was not on his side because Burns was rushed to the hospital the next morning. In any event, the nurse's advice did not assuage plaintiff's concern. Within three weeks of the funeral, plaintiff consulted counsel concerning the treatment Burns received at Harborside.

Our dissenting colleagues invoke *Mancuso v. Neckles,* 163 *N.J.* 26, 747 *A.*2d 255 (2000), to reach a contrary conclusion. They postulate that this is a complex medical malpractice case and therefore the statute of limitations should not begin to run until plaintiff received Burns' medical records.

In *Mancuso,* plaintiff, a breast cancer victim, began mammography diagnosis in 1988, when she was thirty-seven years old. *Id.* at 30, 747 *A.*2d 255. She was diagnosed with breast cancer in July 1992, and underwent bone marrow transplant and debilitating radiation therapy. *Ibid.* In December 1992, plaintiff learned that her 1991–mammography films showed abnormalities. *Id.* at 31, 747 *A.*2d 255. She consulted an attorney in June 1993, and in July 1994, she filed a medical malpractice action against Dr. Neckles, the physician identified by her expert as the physician whose fault allowed cancer to spread. *Id.* at 32, 747 *A.*2d 255. During discovery, plaintiff learned from Dr. Neckles' expert that in 1989, Dr. Bernart may have failed to read the mammography correctly. *Ibid.* After obtaining a new expert who opined that Dr. Bernart deviated from accepted standards of care, she filed an amended complaint in July 1999. *Ibid.* Based on the running of the statute of limitations, the trial court dismissed plaintiff's complaint against Dr. Bernart and the Appellate Division affirmed. *Id.* at 33, 747 *A.*2d 255. In reinstating the complaint against Dr. Bernart, we concluded that "when a patient has relied on competent expert advice that one or more of her treating physicians did not contribute to the patient's injuries, later assertions to the contrary by a competent expert would then provide the 'basis for an actionable claim.' " *Id.* at 37, 747 *A.*2d 255 (citation omitted). In reaching that conclusion, we explained that in cases of complex medical causation, " '[n]ot only is the nature of the injury generally unclear, its very existence is frequently masked.' " *Id.* at 34, 747 *A.*2d 255 (citation omitted).

Unlike in *Mancuso,* this case is not about a complex medical causation issue. Rather it is a simple case where a plaintiff is aware of facts that suggest the fault of a third party may have

caused or contributed to the death of the victim, but further investigation is needed. The plaintiff need not have knowledge of the basis for legal liability or even that he is able to prove a cause of action. All that is required is that the facts suggest to a reasonable person that a third party's conduct, here Harborside, contributed to the injury. Under those circumstances, there is no need to apply the discovery rule because plaintiff has ample time to investigate and file a timely complaint.

In the vast majority of cases, and this is one of those cases, plaintiff will have sufficient knowledge that a wrong has occurred to prompt an investigation. The main consideration behind statutes of limitations is "one of fairness to the defendant." *Lopez v. Swyer*, 62 *N.J.* 267, 274, 300 *A.*2d 563 (1973). The dissent would disregard that principle and delay the start of the running of the statute of limitations until the whimsical date plaintiff decided to review the medical records. That methodology would extend the statute of limitations in almost every medical malpractice case.

In short, "[t]he linchpin of the discovery rule is the unfairness of barring claims of unknowing parties." *Mancuso, supra,* 163 *N.J.* at 29, 747 *A.*2d 255. At the time of Burns' death, plaintiff was not an unknowing party. He knew or should have known of sufficient facts to alert "a reasonable person exercising ordinary diligence," that Harborside's conduct may have caused or contributed to Burns' death. *Martinez, supra,* 163 *N.J.* at 52, 747 *A.*2d 266. In this case, we find no justification to apply the discovery rule to plaintiff's cause of action against Harborside.

Justice ZAZZALI concurring in part, and dissenting in part.

Since we embraced the seemingly straightforward discovery rule over forty years ago, our jurisprudence has applied that equitable doctrine to accommodate varied and complex factual circumstances. That precedent should enable us, in this appeal, to determine the appropriate formulation of the discovery rule in the context of a complicated medical malpractice case.

Although I agree with the concurrence in its decision to remand as to Somerset Medical Center, I respectfully disagree with its conclusion that plaintiff exceeded the statute of limitations in the Harborside matter.

I.

The per curiam opinion fairly sets forth the relevant facts in this appeal. I emphasize only the following.

On April 15, 1999, plaintiff visited his friend, Eugene Burns, at Harborside Nursing Home. During his visit of approximately two hours, plaintiff understood that Burns was afraid and dissatisfied with the care he was receiving. Plaintiff spent the rest of that day trying to locate alternative care for Burns. However, the next morning plaintiff received word that Burns was struggling to breathe and that Harborside had transferred him to Somerset Medical Center. The next day, a doctor from Somerset informed plaintiff that Burns had died of heart failure.

Two to three weeks later, plaintiff contacted an attorney who advised him to obtain the decedent's medical records. Plaintiff certified that "upon obtaining those records [he] realized that [his] suspicions concerning the cause of [Mr. Burns's] death might rest at the hands of Harborside." Plaintiff filed a complaint on April 26, 2001.

The experts' reports indicate the following medical history of decedent. In 1999, doctors discovered that Burns had an ascending aortic aneurysm during a pre-operation medical exam relating to reconstructive knee surgery. On February 5, 1999, doctors at Robert Wood Johnson University Hospital operated on Burns and replaced the aortic valve. The same day, they operated for tamponade (the restriction of the heart due to an accumulation of fluid). Post-operation, Burns failed to breathe adequately and was reintubated. Because he could not be taken off of a ventilator, Burns required a tracheotomy. While at Robert Wood Johnson, Burns suffered from pneumonia and colitis. On April 13, 1999, Robert Wood Johnson transferred Burns to Harborside for

continued full-time care. Burns died on April 17, 1999, at Somerset Hospital.

The defense expert stated that the cause of Burns's death was "overwhelming septic shock as a result of severe pseudomembraneous colitis complicated by fecal impaction and massive cecal distention with probable syndrome of toxic megacolon." The plaintiff's expert asserted that "the combined respiratory arrest with hypoxia and later development of coma and respiratory acidosis ... cause[d] the untimely death of" Burns.

## II.

Under the equitable doctrine of the discovery rule, "a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim." *Lopez v. Swyer,* 62 *N.J.* 267, 272, 300 *A.2d* 563 (1973). This equitable doctrine tempers the harshness of statutes of limitations, which are "designed to stimulate litigants to pursue their actions diligently." *Mancuso v. Neckles,* 163 *N.J.* 26, 29, 747 *A.*2d 255 (2000). The discovery rule requires that a plaintiff have "knowledge not only of the injury but also that another is at fault" to start the statutory period. *Guichardo v. DeLisi,* 177 *N.J.* 45, 51, 826 *A.*2d 700 (2003) (internal quotation marks and citation omitted).

However, in cases of complex medical causation, such as the present matter, "it is not at all self-evident that the cause of the injury [is] ... the fault of ... a third party." *Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255 (internal quotation marks and citation omitted). Because fault is not readily ascertainable in such situations, we apply a specialized formulation of the discovery rule and "require[ ] [more] than mere speculation or an uninformed guess" to start the statutory period. *Ibid.* A plaintiff must have "some *reasonable medical support* that there was a causal connection between [the plaintiff's] condition and [the defendant's] conduct" before we will deem him or her to have the requisite knowledge of

the facts that trigger the statutory period. *Ibid.* (emphasis added) (internal quotation marks omitted); *see also Guichardo, supra,* 177 *N.J.* at 51, 826 *A.*2d 700; *cf. Vispisiano v. Ashland Chem. Co.,* 107 *N.J.* 416, 437, 527 *A.*2d 66 (1987) (recognizing toxic tort plaintiffs must have some reasonable medical support to trigger statute of limitations in discovery rule context).

### III.

Because the concurrence deems plaintiff to have had sufficient knowledge of Harborside's fault based solely on his personal observations, rather than reasonable medical support, I dissent on that issue.

### A.

As Burns's medical history demonstrates, this appeal presents a case of complex medical causation. The cause of Burns's death is so unclear that the medical experts did not articulate the same cause of death. The defense expert stated that the theory that the allegedly inadequate suctioning at Harborside led to Burns's death "is a totally unsubstantiated conclusion and [is] ignorant of the obvious cause of death in this case," i.e., septic shock. Plaintiff's expert stated the opposite. Additionally, in the two and one-half months preceding his death, Burns did not suffer from just one ailment. Rather, he endured a series of medical conditions including an aortic aneurysm, an inability to breathe on his own, pneumonia, and colitis. Moreover, the Harborside nurse's statement that the doctor's orders prohibited her from suctioning Burns, other than at specified intervals, further masked the cause of Burns's death because a layperson would not be able to determine if such an order was medically inappropriate. Finally, at oral argument defense counsel agreed with the principle "that without the medical records there is no conceivable way that anyone would have a reasonable basis on which to conclude that there was an actionable claim." It is for this type of malpractice

case that we have developed the complex medical causation formulation of the discovery rule.

### B.

I believe that plaintiff satisfied the statute of limitations period because he filed his complaint within two years of obtaining "some reasonable medical support" demonstrating a causal connection between Burns's death and Harborside's conduct. *See Mancuso, supra,* 163 *N.J.* at 34, 747 *A.*2d 255.

The concurrence's conclusion that plaintiff discovered Harborside's negligence at the time of Burns's death hinges on language in *Martinez v. Cooper Hospital–University Medical Ctr.,* 163 *N.J.* 45, 52, 747 *A.*2d 266 (2000): "The question is whether the facts presented would alert a reasonable person ... that he or she was injured due to the fault of another ... whether plaintiff knew or should have known of sufficient facts to start the statute of limitations running." (Internal quotation marks and citation omitted). However, in *Mancuso, supra,* decided the same day as *Martinez,* we further modified "knowledge of fault" in the unique circumstances of complex medical causation cases. 163 *N.J.* at 34, 747 *A.*2d 255. In such situations, the statute of limitations will not start until plaintiff has "some reasonable medical support" for his suspicions. *Ibid.*

Under that formulation of the discovery rule, plaintiff first discovered Harborside's malpractice when he received Burns's medical records—some time after plaintiff consulted with his attorney two to three weeks after Burns's death. As the concurrence notes, those records "evidenced that the medical care Burns received at Harborside contributed to his death." *Ante* 182 *N.J.* at 279, 865 *A.*2d at 639. Until that point, as defense counsel conceded at oral argument, plaintiff could only "speculate" or make an "uninformed guess" that Harborside had been negligent. The contradictory conclusions of the medical experts demonstrate the problematic causal nexus in this case. It is unfair to demand that plaintiff—a former police officer and gas station owner—be

able to identify a causal connection between Burns's death and Harborside's refusal to suction Burns. Indeed, this Court, in our unanimous per curiam opinion, does not expect laypersons to understand fully the medical significance of suctioning, given the inclusion of a footnote explaining the technical process and function of suctioning. *Ante* 182 *N.J.* at 278, 865 *A.2d* at 638. Nonetheless, the concurrence requires this plaintiff to recognize the causal nexus between Harborside's conduct and Burns's death without the aid of some reasonable medical support.

In complex medical causation cases like the present matter, it is not enough for statute of limitation purposes that plaintiff knew that Burns was dissatisfied with the care he received. Rather, *Mancuso, Vispisiano,* and *Guichardo* instruct that plaintiff must have some reasonable medical support for his belief that defendant committed medical malpractice. The heart-wrenching pleadings of a frightened and sick man do not constitute medical support, even if the patient's fears are later realized. To hold otherwise is to encourage plaintiffs to file medical malpractice claims, even in the unique circumstances of complex medical causation, whenever they are dissatisfied with their treatment without first obtaining some reasonable medical support for their claims. That approach invites frivolous litigation and is inconsistent with our decision in *Martinez, supra,* 163 *N.J.* at 58, 747 *A.2d* 266, on which the concurrence depends. There, we held:

> It is not necessary every time a person dies in a hospital for his or her relatives to immediately suspect malpractice. People die in hospitals in the absence of wrongdoing (for example, those gravely injured in accidents and the infirm elderly). Many times complications arise even if a procedure is performed perfectly. [*Ibid.* (citing *Newmark v. Gimbel's Inc.,* 54 *N.J.* 585, 596–97, 258 *A.2d* 697 (1969)).]

As in *Martinez, supra,* we should not expect the lay plaintiff here to immediately suspect that Harborside's refusal to suction Burns contributed to his friend's death. Indeed, as one of Burns's nurses later testified at her deposition, the decision *not* to suction serves a legitimate medical purpose: "to train [patients' bodies] to [cough] up the secretions by themselves," which prevents them from becoming dependent on suctioning. Moreover, Burns's need

of a tracheotomy and twenty-four hour care evidences the gravity of his condition in the days and weeks before his death. A reasonable person easily could have believed that Burns simply suffered complications from his illnesses. *Ibid.* Indeed, given Burns's recent medical history, that was the sensible inference to be drawn at the time. Unlike situations of obvious medical malpractice—such as the amputation of the wrong leg—this appeal involves a complicated series of events that ultimately caused Burns's death.

Moreover, this matter presents a less obvious case of third party fault than did *Guichardo, supra,* where we applied the discovery rule and allowed plaintiff to assert a claim against defendant eight months after obtaining an expert's opinion that defendant's negligence contributed to plaintiff's injury and almost four years after the negligence occurred. 177 *N.J.* at 55, 826 *A.*2d 700. There, the defendant physician admitted to plaintiff that "something went wrong with" the procedure two days after he negligently failed to diagnose plaintiff's condition. *Id.* at 48, 826 *A.*2d 700. In contrast, here, plaintiff did not have the benefit of an admission by Harborside. Yet, plaintiff was still able to assert his claim only two years and eleven days after the negligence occurred. Thus, the facts supporting application of the discovery rule in this matter are even more compelling than in *Guichardo.*

In sum, consistent with our decisional law, I would not require plaintiff to differentiate between a case of medical malpractice and one of unavoidable death without the benefit of some reasonable medical support. To insist on that expertise, even when the plaintiff observes defendant's negligent behavior, in effect requires that a layperson understand the medical consequences of a health care professional's decisions. Although such a requirement may be appropriate in general medical malpractice cases, that expectation is inconsistent with the equitable nature of the discovery rule when applied in the context of complex medical causation.

Accordingly, I would hold that the statute of limitations began to run when plaintiff obtained Burns's medical records. As de-

fense counsel conceded at oral argument, plaintiff had no reasonable basis for concluding that he had an actionable claim against Harborside until he obtained those records. She also acknowledged that without those records there was no conceivable way that anyone would have a reasonable basis to conclude that there was an actionable claim. It is my view, as well, that plaintiff initially discovered or should have discovered that he might "have a basis for an actionable claim" against Harborside when he received those records. *Lopez, supra*, 62 *N.J.* at 272, 300 *A.*2d 563. Although the exact date is unclear, it is certain that plaintiff did not receive those records before May of 1999. Under that construct, the statute of limitations expired no earlier than May of 2001. Because plaintiff filed his complaint on April 26, 2001, he did so within the two-year statute of limitations.

## IV.

The concurrence states that the approach I support would delay the start of the limitation period "until the whimsical date" when the plaintiff receives the medical records. *Ante,* 182 *N.J.* at 286, 865 *A.*2d at 643. As a result, that methodology would extend the limitations period "in almost every medical malpractice case." *Ante,* 182 *N.J.* at 286, 865 *A.*2d at 643.

Respectfully, that fear is groundless. The methodology that I describe is neither whimsy nor whim. It is the established procedure that is rooted in the *Mancuso, Vispisiano,* and *Guichardo* trilogy. Far more important, the spectre that the concurrence imagines—that this procedure would extend the statute of limitations in "almost every medical malpractice case"—is, like all spectres, an illusion. As a general rule, it is not in a plaintiff's interest to delay the commencement of litigation. More to the point, even if a plaintiff does protract matters, the fear of an open-ended process is misplaced. Less than two years ago, when we applied the discovery rule in *Guichardo, supra,* we also stated that "nothing in our jurisprudence ... would bar the application of other equitable principles such as unclean hands or laches to avoid

undue prejudice to a potential defendant." 177 *N.J.* at 55–56, 826 *A.*2d 700. The laches defense applies when plaintiff "delay[s] for a length of time which, unexplained and unexcused, is unreasonable under the circumstances and has been prejudicial to the other party." *Mancini v. Twp. of Teaneck,* 179 *N.J.* 425, 437, 846 *A.*2d 596 (2004) (internal quotation marks and citation omitted) (recognizing applicability of laches in context of continuing violation of Law Against Discrimination).

In some instances of complex medical causation, an unknowing plaintiff may not have any reason to suspect medical malpractice until the statutory period has passed. *See, e.g., Mancuso, supra; ante* at 182 *N.J.* 285, 865 *A.*2d at 642. In such circumstances, the defense of laches may or may not be convincing. In other complex medical causation cases, like the present one, a plaintiff may have the "mere suspicion" of medical malpractice but lack reasonable medical support for that belief. If such a plaintiff unreasonably delays in obtaining reasonable medical support, a defendant could invoke a laches argument and likely avoid application of the discovery rule. Thus, my approach appropriately recognizes the purpose of statutes of limitations—to encourage potential plaintiffs to diligently pursue their claims.

Quite apart from exactly when plaintiff obtained the medical records, it appears, as defense counsel conceded at oral argument, that plaintiff acted diligently for discovery rule purposes. *Cf. Guichardo, supra,* 177 *N.J.* at 49, 826 *A.*2d 700 (applying discovery rule where plaintiff obtained expert opinion implicating defendant nearly four years after negligence occurred); *Mancuso, supra,* 163 *N.J.* at 30, 747 *A.*2d 255 (applying discovery rule where plaintiff obtained expert opinion implicating defendant seven years after negligence occurred). Nonetheless, as a matter of fairness, I would remand to the trial court to allow Harborside the opportunity to assert its laches argument. Indeed, each party would be permitted to make equity-based arguments on remand. The trial court would then determine whether it is fair to allow plaintiff to proceed with his claim.

## V.

As for the concurrence's reasonable person test, I recognize that plaintiff read Burns's note, was confused by the nursing staff's contradictory statements regarding Burns's treatment, knew that the decedent had trouble breathing, and knew of the cause of death. However, I do not believe that those facts would cause a reasonable person to recognize that Harborside may have committed medical malpractice.

First, the fears of a gravely ill, seventy-eight year old man, who was dissatisfied with the care and attentiveness he received from the staff, do not necessarily indicate that medical malpractice occurred. This is true even though those same facts spurred plaintiff to make Burns more comfortable by seeking care for him elsewhere. Second, the nurse's statement concerning the suctioning orders does not indicate that plaintiff knew or should have known of Harborside's negligence because a reasonable layperson would not understand all of the medical consequences of a decision not to suction, or to suction at particular intervals, especially in light of the confusing and contradictory information with which plaintiff was presented that day. Finally, the causal connection between Burns's difficulty breathing, Harborside's refusal to suction, and Burns's ultimate death is technical and not at all obvious to a non-medically trained layperson. Indeed, considering that Burns began struggling to breathe after his surgery, plaintiff may not have immediately assumed that a lack of suctioning caused Burns's continued struggle to do so while at Harborside. Moreover, the Somerset doctor who informed plaintiff of Burns's death explained, and plaintiff understood, the cause as "heart failure"—a cause that does not, of itself, suggest a connection to suctioning.

Thus, even applying the test of the concurrence, I would hold that plaintiff did not have sufficient information at the time of Burns's death to begin the statute of limitations. Because I believe that plaintiff should receive the benefit of the discovery rule, I respectfully dissent with respect to defendant Harborside. As noted, however, I would remand to allow both sides to present

their equity arguments more fully. That approach fairly balances the interests of the parties.

Justices LONG and ALBIN join in this opinion.

*For affirmance as to Harborside*—Chief Justice PORITZ and Justices WALLACE and RIVERA–SOTO—3.

*For reversal as to Harborside*—Justices LONG, ZAZZALI and ALBIN—3.

*For reversal and remandment as to Somerset*—Chief Justice PORITZ and Justices LONG, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.